ELSIE B. SMITH and L. KENNETH SMITH, Plaintiffs-in-Error, v. H. E. STEELE and GWENDOLYN STEELE, Defendants-in-Error. —313 S. W. (2d) 495.

Western Section, Jackson. August 23, 1956.

Rehearing denied September 28, 1957.

Certiorari denied by Supreme Court February 8, 1957, May 3, 1957.

240

242

Anthony A. Aspero, Nell Sanders Aspero, Aspero & Aspero, Memphis, for plaintiffs in error.

Allen Cox, Jr., Carroll C. Johnson, Memphis, for defendants in error.

AVERY, P. J. (W. S.) The plaintiff below, Elsie B. Smith, brought damage suit against the defendants below, H. E. Steele and Gwendolyn Steele, for personal injuries growing out of a collision of automobiles which occurred at the intersection of Overton Park Avenue with North Watkins Street in the City of Memphis. Plaintiff sued for $200,000, of which the first count of her declaration alleges $100,000 for actual and compensatory damages, and the second count of her declaration is for an additional $100,000 as special and punitive damages.

There is also a suit by L. Kenneth Smith, husband of Elsie B. Smith, against the defendants, H. E. Steele and Gwendolyn Steele, seeking to recover damage in the amount of $10,306.49. The first count of the declaration seeks $10,000 damages growing out of the injury to his wife, which the declaration alleges required him to expend large sums for medical aid, hospitalization, and for damages resulting from being denied his rights and privileges as a husband and the loss of her assistance and

attention in the home and at his place of business. The second count of that declaration charges damages to the automobile in the sum of $306.49.

By both declarations the negligence charged against the defendant, Gwendolyn Steele, in the first counts thereof, which are common law counts, is that the defendant, Gwendolyn Steele, drove her automobile at a dangerous rate of speed, without keeping a proper lookout ahead, without having the vehicle under control, by ignoring the stop sign on North Watkins Street, and entering the intersection without first stopping, and by crashing head-on into the left side of the vehicle plaintiff was driving. In the second counts of both declarations, defendant is charged with violating certain Municipal Ordinances of the City of Memphis, Volume 1, Chapter 42, Sections 1682, 1683, 1688, 1713, 1738, and 1739, which generally relate to reckless driving; speed limit of 30 miles per hour; approaching intersection without giving right-of-way to the vehicle in the intersection, driving in a careful manner and observing stop signs erected by municipal authorities and the right-of-way of vehicles on through streets, all of which it is alleged that defendant violated.

The two automobiles came together in the aforesaid intersection on March 19, 1954, while Mrs. Elsie B. Smith was driving her husband's Buick automobile in a westerly direction on Overton Park Avenue, which is a Through Street for that intersection, and Mrs. Gwendolyn Steele was operating a Ford automobile which she was driving in a northerly direction on North Watkins Street, which is a Stop Street for that intersection.

The declarations allege that at the time of the collision, the plaintiff Elsie B. Smith was in her second trimester of pregnancy and was wearing maternity supports for the protection of her unborn child, and that as a result of the impact she was greatly frightened, severely nervous, placed on a stretcher and transported to the hospital by ambulance; that she suffered pain in her left shoulder and neck; injury to her cervical spine; that her head was lashed about and that she has suffered pain continuously, her injuries having failed to heal and becoming worse, resulting in dizziness, etc. While the declarations set out at great length the kind of suffering the plaintiff Elsie B. Smith had undergone, and her fears that she might lose her baby or that it would be disfigured, together with the injuries creating severe mental anguish and pain, all of same are generally referred to as conditions which exist in the body of a pregnant woman from a "whiplash" injury.

The pleas filed by the respective defendants, H. E. Steele and Gwendolyn Steele, to the respective counts of the declarations are that of not guilty; contributory negligence; and by detailed "specific and special pleas" to the effect that Mrs. Steele proceeded into the intersection in a careful manner; that the view across the southeast corner of the intersection is obstructed and that the intersection is a blind intersection, so that traffic proceeding west on Overton Park Avenue cannot be seen by drivers of vehicles proceeding north on Watkins Street until the intersection is reached; that when Gwendolyn Steele drove into the intersection before it was entered by plaintiff, the plaintiff then came into the intersection and struck defendant's car; that Mrs. Steele put on her brakes and did everything she could to prevent the col-

lision; that Mrs. Smith was driving at a dangerous and reckless rate of speed; was not keeping a proper lookout ahead and did not put on her brakes or make any attempt to avoid the accident when she saw, or should have seen, the accident was imminent; that she did not have her vehicle under control, and she categorically denies each and every allegation of negligence contained in the declarations, except that she admits having not stopped completely before entering the intersection.

As to the second counts of the declarations, the pleas reiterate the specific allegations of contributory negligence set out in the first count, and reiterate the care exercised by Mrs. Steele, all as set out in the pleas to the first counts, and specifically deny that Gwendolyn Steele was acting as the servant and agent of H. E. Steele.

Both cases were tried at the same time to a Court and jury, with separate verdicts being rendered in accord with the instructions of the Court. The verdict in favor of Elsie B. Smith and against both defendants was $550. The verdict in favor of L. Kenneth Smith against both defendants was for $375. Both verdicts were approved by the Trial Judge. Motions for new trials were made, overruled, exceptions preserved, appeals prayed, granted, and perfected to this Court, where the plaintiffs below, Elsie B. Smith and her husband, L. Kenneth Smith, have assigned errors.

Assignments of Error I to IV, both inclusive, are to the simple effect that the verdicts are so inadequate as to evince passion, prejudice, corruption, unaccountable caprice, or compromise on the part of the jury.

Assignment of Error V is levelled at the refusal of the Trial Court to, upon motion of plaintiffs, direct the jury to return verdicts in favor of plaintiffs.

Assignment of Error VI is levelled at the refusal of the Court to grant a new trial upon newly discovered evidence.

Assignment of Error VII is levelled at the refusal of the Court to give in charge to the jury certain special requests by plaintiffs. This Assignment is made up of: (a) request for special instructions with respect to "Obstruction of View"; (b) "Wantonness of a Defendant in Driving Automobile" and "Wanton Injuries by Auto"; (c) with respect to "Punitive Damages"; (d) elements included in measure of damages; "Mental Suffering Different from Physical"; "Life Expectancy"; and "Purchasing Power of Today's Dollar".

Assignment of Error VIII is levelled at the instructions given by the Court to the jury with respect to the duty of an operator of a vehicle on a Stop Street and the operator of a vehicle on a Through Street.

Assignment of Error IX was levelled at the action of the Court in directing the jury to consider the case only upon the issues made by the pleadings with respect to actual damages as explained by the Court and not to consider the issue with respect to punitive damages.

Assignments of Error X and XI are levelled at the action of the Court in overruling plaintiff's motion requesting the Court to physically deliver to the jury the written charge.

Assignment of Error XII is levelled at the action of the Court in refusing to grant plaintiffs' motion to rehear

and reconsider the plantiffs' "Motion to Rehear and Reconsider Motions for New Trials".

■ Let us first deal with plaintiffs' Assignment of Error VIII. We have carefully read the entire charge of the Court and have re-read that part of the charge dealing with the law relative to the duty of the operator of a motor vehicle to stop at an intersection where there is a stop sign. The Court charged the jury in this connection, that:

"It is the contention of the plaintiffs that this collision and resultant injuries to Mrs. Smith and damages to Mr. Smith was the direct and proximate result of the negligence of the defendant Mrs. Steele, in that they say that she failed to bring her car to a stop in compliance with the city ordinance and the stop-sign erected at the southeast corner, but instead entered the intersection without keeping a proper lookout and without having her car under control and in failing to yield the right-of-way to the plaintiff Mrs. Smith.

"Now, Lady and Gentlemen of the Jury, if you find from the greater weight or preponderance of the evidence this theory and contention true, then you should return your verdicts for both plaintiffs in these two cases." (R. 368)

And again he said:

"Now, Lady and Gentlemen of the jury, under the City Ordinance Overton Park Avenue is designated as a through Street and North Watkins Street is designated as a stop street at this particular intersection. This simply means that a vehicle traveling

on a through street has the preferential right-of-way over vehicles traveling on a stop street. The operator of the vehicle on the through street has a right to assume that the driver of a vehicle traveling on the stop street will bring his vehicle to a stop before entering the through street, in compliance with this ordinance. The operator of a vehicle on the through street, in exercising his or her preferential right-of-way, shall exercise reasonable or ordinary care, and if in the exercise of reasonable and ordinary care, he sees or should see that the other driver is not obeying the law, it is his duty to exercise reasonable and ordinary care to prevent a collision. It is the duty of the operator of the vehicle on the stop street to bring his vehicle to a complete stop before entering such through street, and shall not proceed until such entrance into the through street may be made without interference of traffic on such through street. The operator of the vehicle on the stop street has the right to assume that the operator of a vehicle on a through street will comply with the law, with reference to speed of his vehicle and will be in the exercise of reasonable and ordinary care as he approaches and enters the intersection.'' (R. 366, 367)

We think the learned Trial Judge properly charged the jury. The failure to stop, as is the failure to comply with the traffic laws, at intersections or otherwise, must be found to constitute the proximate cause of the accident and resulting injury. There is nothing misleading about the Court's charge in this regard.

In Duling v. Burnett, 1938, 22 Tenn. App. 522, 534, 124 S. W. (2d) 294, 302, it is said:

"* * * Whether plaintiff or defendant had the 'right of way' at the time and place of the collision is not a determinative question. The mere fact that one vehicle has the right of way over another at a street intersection does not relieve the driver of the vehicle thus favored from the duty of exercising due care not to injure others at the street intersection * * *" See Maxwell v. Kirkpatrick, 22 Tenn. App. 21, 116 S. W. (2d) 340, 344.

Giving attention now to the plaintiffs' Assignment of Error IX, by which it is insisted the Court erred in his instructions to the jury to give no consideration to the question of punitive damages, and confine their consideration to the question of "actual damages as outlined to you by the Court, provided, of course, you find that the plaintiffs are entitled to recover", it is insisted that such action of the Trial Court was not in accord with plaintiffs' guaranty of trial by jury, in accord with the Constitution of Tennessee, Art. 6, Sec. 9, Constitution of the U. S. Amendment 14.

This Assignment is overruled. After having charged the theory of the respective parties, and coming to that part of the Charge which explained to the jury what damage the plaintiffs would be entitled to, if they found the issues in favor of the plaintiffs, the Court charged the jury in the following manner:

"Now, Lady and Gentlemen of the Jury, should you find in favor of the defendants, you will not be concerned with the question of damages, but should

you find in favor of the plaintiffs you will be concerned with the measure of damages. Should you find in favor of the plaintiff Mrs. Smith, the Court instructs you that she would be entitled to recover an amount that you say would fairly compensate her for the injuries that you find were negligently inflicted upon her, taking into consideration the nature and extent of her injuries, their kind, character and duration, the amount of mental and physical pain that she has suffered, or will continue to suffer, due to her injuries, and the extent of any physical disability that she has suffered, if any, due to her personal injuries. In the case of L. Kenneth Smith, he would be entitled to recover for medical expenses, such as hospital and doctor bills, and other medical expenses, rendered necessary in order to relieve his wife of her injuries and medical expenses, such as doctor and hospital bills he will be put to in the future, in order to restore his wife to her normal condition, if you so find from the proof in the case that he will be put to these expenses, and also for loss of his wife's services. He would also be entitled to recover the amount of money that he has paid to have his car repaired as a result of the damages in this collision.'' (R. 370, 371)

The foregoing is a full and ample charge with respect to the factors and elements entering into the definition of the term ''actual damages.'' Neither the provisions of the State Constitution nor the Federal Constitution with respect to due process and trial by jury, are violated by this charge. After having carefully read the testimony in the case, we concur in the action of the Trial Judge in withdrawing from the jury any consideration

with respect to "punitive damages". The minds of reasonable men could not differ in their consideration of the testimony revealed by this record upon the issue of "wanton and willful negligence" of Mrs. Steele, concerning the way and manner in which she entered the intersection where this collision occurred, and could not have concluded that Mrs. Steele was guilty of wanton negligence. It is not necessary to comment further upon this Assignment.

■ Assignments of Error X and XI, to the effect that the Court erred by refusing to grant the motion of plaintiffs for the physical delivery by the Trial Judge to the jury of the Court's written charge, are overruled.

The only requirement of the Trial Judge that his charge be in writing in civil cases, originated with the Acts of 1875, Chapter 37, by which the Trial Court upon application of either party to a civil suit was required to produce his charge in writing. Neither by statutory law nor judicial construction is there any requirement that the Court deliver his written charge physically to the jury. T. C. A. Sec. 20-1315; Phillips v. Newport, 1945, 28 Tenn. App. 187, 187 S. W. (2d) 965.

In the instant case, however, we commend the Trial Court in saying to the jury in his written charge:

"Now, I say to you, Ladies and Gentlemen, under the law, by request of a party the Court has to reduce its charge to writing. That request has been made by the attorneys for the plaintiffs, which they had a right to do. Now, there is some question about whether you should have that written charge in the juryroom. I am not going to send it back to you

now; but if there is any question that arises in your minds, during your deliberations back there, and you wish to have the Court re-read this charge, or any portion of it, the Court will be glad to comply with your request, upon its being made known to the Court." (R. 372, 373)

For their authority in connection with these two Assignments, counsel for plaintiffs base their position on State v. Missio, 105 Tenn. 218, 58 S. W. 216; Insurance Co. v. Trustees, etc., 91 Tenn. 135, 137, 18 S. W. 121. Neither of these cases constitute any authority for the contention made by plaintiffs' counsel in this regard. Likewise, there is nothing in T. C. A. Sec. 20-1315 requiring the Court to permit the jury to physically have the written charge. The fact that the law requires a written charge to be delivered to the jury in a felony case, as provided by Sec. 40-2516, T. C. A., in no way amends, modifies or restricts the provisions of Sec. 20-1315, T. C. A., in any manner.

▮ Passing now to Assignment of Error XII, this Assignment attacks the action of the Court with respect to the "Motion to Re-Hear and Reconsider Motions for New Trials". (R. 46, 47)

This Motion was filed on October 26, 1955. (R. 443). The same day the Trial Court entered an Order granting an appeal, granting 30 days extension to file appeal bond and 60 days extension to prepare and file Bill of Exceptions. The original judgments were entered June 9, 1955. Motion for New Trials was filed June 22, 1955, and taken under advisement by the Court, and an Amended Motion for New Trials was filed July 13, 1955, by permission of the Court. Order on the original Motion

for New Trials and on the Amended Motion for New Trials overruling same, was entered September 30, 1955. When this "Motion to Re-hear and Reconsider Motions for New Trials" was filed on October 26, 1955, the Court ordered:

"It Is Now, Therefore, Ordered, Adjudged And Decreed that the Court is of the opinion that it now lacks jurisdiction to consider the motion to rehear and reconsider motions for new trials as presented herein. If, however, the Court does have jurisdiction, then the motions to re-hear and reconsider motions for new trials as amended and presented herein are in all things overruled, and the Court is of the opinion that they come too late and that as to any new matters in the motions for new trials, the Court is without jurisdiction now to consider them, but as to all matters contained in the original motions or amended motions for new trials or for a rehearing on same, the Court is of the opinion that they also are without merit, come too late, and should in all things be overruled and disallowed, and it is so Ordered, Adjudged And Decreed.

"To all of which action of the Court, plaintiffs, through their attorneys, respectfully note exceptions." (R. 47)

The Trial Court, in its discussion on the case, also referred to Suzore v. Rutherford, 35 Tenn. App. 678, 685, 686, 251 S. W. (2d) 129, 132, cited by this Court, Opinion by Justice Swepston of the Supreme Court of this State, as controlling his action. In that case there was offered an amended motion for new trial, supported by the affidavits of three jurors, respecting false state-

ment made by one of the jurors on his voir dire. Judgment in the case had been entered at a prior term. Original motion for new trial was taken under advisement by the Court and heard in a subsequent term, during which the amended motion was offered. This Court said:

"When the amended motion for a new trial was filed, the term of court at which the judgment was entered had expired, that is, the March term had expired. A judgment becomes final upon either the lapse of 30 days or the end of the term, whichever first happens, but a motion for a new trial seasonably filed suspends the judgment for the purpose of disposing of the motion only; it does not, however, suspend the judgment for all purposes. Such motion seasonably filed may be disposed of after 30 days or after the end of the term, but if it be disposed of after the expiration of either period, the trial judge has no further jurisdiction over the case, if he overrules the motion, except as to allowance and perfection of appeal.

"The foregoing simply abstracts and paraphrases the excellent discussion by Judge Howell in the case of Schulman v. Ridley, et ux., 29 Tenn. App. 503, 508-509, 197 S. W. (2d) 895, in which the authorities are cited and quoted."

The only difference in that case, if there be any difference whatever,—is in the fact that counsel for plaintiffs in the instant case titled their motion "Motion to Re-Hear and Reconsider Motions for New Trials". In the argument that followed with respect to this motion, counsel for plaintiffs said:

"We are not filing an amended motion. All the grounds are set out in the original motions, compromise, and that the verdicts are not supported by the law and evidence, that the verdicts are contrary to the law, and that the instructions to the Jury have been ignored."

When that statement was made, the Court inquired of counsel:

"Do you have some additional grounds in this new motion?

"Mrs. Aspero: They are not additional grounds. They are simply elucidations and analyses in support of the original grounds." (R. 452, 453)

Following this colloquy between the Court and counsel for plaintiffs, the Court recessed for a short while to give counsel for plaintiffs opportunity to find some authority for their position. When the argument resumed, counsel for plaintiffs again said:

"This is not an amended motion. This is a motion to re-hear and reconsider. This other was an amended motion with additional grounds for a new trial. The distinction is clear. Our amendment came properly, in the same term, filed in the May term." (R. 462-3)

Counsel for plaintiffs then introduced and relied upon the case of East Tennessee & W. N. C. R. R. Co. v. Winters, 85 Tenn. 240, 1 S. W. 790. This case is not in point for many reasons. Included in the Bill of Exceptions before the Court in that case were the affidavits of jurors showing the illegal manner in which the verdict

was arrived at. The Trial Judge had permitted them to be made a part of the Bill of Exceptions which he signed. They were presented to him within an hour or two after the Court had adjourned, which was the last day of the term, but the minutes had not been written nor signed, and the Supreme Court is certainly bound by what the Trial Court had shown in the Bill of Exceptions. In that Opinion, 85 Tenn. at page 250, 1 S. W. at page 793 the Court said:

"Without deciding that it would have been error for him to have refused to let any thing appear in the bill of exceptions which transpired between himself and the attorney at his hotel, when the papers were first presented, we hold that, when it appears *from the affidavits of jurors in the bill of exceptions* that a verdict was reached in the manner so clearly shown in this case, we will not lend the aid of this court to the enforcement of such a verdict, by an affirmance of a judgment based thereon." (Emphasis added.)

The two principal aspects in which the instant case differs from that case are:

(1) There are no affidavits of jurors in the Bill of Exceptions before us showing anything whatsoever. Counsel for plaintiffs admitted to the Court that the jurors would not make affidavits and undertook to supply the necessity for such jurors' affidavits, by saying:

"I make oath right now, (raising right hand) that this motion to re-hear and reconsider was filed as soon as the facts had been ascertained. I ascertained the facts myself." (R. 463)

(2) Counsel admits that the matters now brought to the attention of the Court by their motion are not new matters, but were included and embraced in the original motion for a new trial and the amendment thereto allowed by the Court as hereinbefore shown. The Court had passed upon and overruled the entire motion as amended for a new trial, and if the Court had jurisdiction on October 26, 1955, to have given consideration to the "Motion to Rehear and Reconsider Motions for New Trials", it would have been purely a discretionary matter, and the length of time having elapsed after the original judgment, the original motion for a new trial, and the amendment allowed by the Court thereto, had certainly furnished counsel an opportunity to make every investigation necessary to ascertain what the facts were.

In addition to the foregoing, it is observed from the order of the Court hereinbefore quoted, that if he had jurisdiction to give consideration to the motion, it was overruled and disallowed. This record reveals that the Trial Court was indeed patient, and may it be said long-suffering, in granting time for the hearing of the motion for a new trial and his consideration thereof.

For the reasons stated, we are constrained to overrule Assignment of Error XII.

Assignment of Error VII is composed of four parts alphabetically numbered (a) to (d) inclusive. Counsel for plaintiffs in their argument have limited it to parts (b) and (c) which deal with the question of wantonness and punitive damages.

In disposing of Assignment of Error IX, wherein we have held that the Court was correct in directing the

jury to give no consideration to the issues raised by the pleadings in respect to wanton negligence and punitive damages, this Assignment of Error VII could have been embraced in what we have had to say relative to Assignment of Error IX. However, the plaintiffs, in support of this Assignment, rely upon the case of Monday v. Millsaps, 37 Tenn. App. 371, 264 S. W. (2d) 6, 18; and Pratt v. Duck, 28 Tenn. App. 502, 191 S. W. (2d) 562.

The facts of the instant case and the case of Monday v. Millsaps, supra, are entirely different. It is true that in Monday v. Millsaps there was sufficient evidence to support the charge of gross and willful negligence. The Opinion in that case then sets out these facts:

"The fact that the truck was traveling on an upgrade of between 5 and 6 per cent, that its dual wheels skidded more than 100 feet, that there was expert evidence that its speed was probably more than 48 miles per hour, that the truck driver admitted that he knew the slickness of the road, that plaintiffs' proof showed that the truck was approximately 600 feet away when the Buick started skidding, together with the fact that there was a shoulder on which the driver when he first saw the Buick could have safely driven the truck, was sufficient to support the charge of gross and willful negligence, and it was for the jury under the charge and under the evidence to decide the issue. Furthermore, this was not reversible error as there were other counts in the declarations supported by material evidence."

In the instant case, the only act from which the Court or jury could have drawn the conclusion that Mrs. Steele

was wanton and grossly negligent is that she admits she did not see the stop sign and therefore did not stop before entering the crossing. Her explanation of the manner in which she drove into the intersection, two of her young children in car with her—Paul 6 years and Barbara 1 year, the facts and circumstances surrounding the position of both cars after the accident, and particularly as shown by photographs, Exh. 2 and Exh. 7 to the deposition of Officer Pennick, and Exh. 1 to cross-examination of Burns, same being Exh. 8 to cross-examination of Pennick, showing skid marks of car driven by Mrs. Steele, their location on the street, length, etc., without referring to the testimony of Mrs. Holcomb who was seated in the car and on the seat with Mrs. Smith, to the effect that Mrs. Steele entered the intersection ahead of Mrs. Smith and the effort made by Mrs. Steele to avoid the accident, clearly indicates that there could have been no gross and wanton neligence on the part of Mrs. Steele.

■ In Assignment of Error VI, counsel for plaintiffs bring forth what is termed "newly discovered evidence", as shown by an affidavit of one Mrs. Grace Lois Bell. (R. 399) In that affidavit the pertinent part of it is that Mrs. Bell affirms that on the day after the accident, by a telephone conversation with Mrs. Holcomb who was in the car with Mrs. Smith at the time of the accident, it was said in effect:

"We didn't see the car until it was right.on us. I threw my arm out right when it happened, right when we were struck, to hold Elsie back so that Elsie wouldn't be thrown over the wheel. It happened so quick. They took Elsie out and took her to the hos-

pital. The lady who ran into us came over to me and asked if there was anything that she could do, and said that she was sorry, that she was talking to her mother-in-law and didn't see the stop sign. This woman deliberately ran into Elsie. We were going about 20 miles an hour. There was nothing that Elsie could do about avoiding the accident—it happened so fast. Thank goodness, I am not hurt. I have been trying to locate Elsie. I don't know whether she is in the hospital, or gone to see the doctor, or at her mother's. I am trying to find out." (R. 399, 400)

Affiant said that she stated nothing to Mrs. Smith about that conversation with Mrs. Holcomb until the day before the affidavit was made on the 11th day of June, 1955.

There is no material difference in what affiant says that Mrs. Holcomb told her and that to which Mrs. Holcomb testified on the witness stand. On direct-examination, Mrs. Holcomb was asked and answered as follows:

"Q. What if anything did she (meaning Mrs. Smith) do to try to avoid the accident, Mrs. Holcomb? A. She hadn't seen them.

"Q. Did she see her up until about the time the accident was going to happen? A. She had never seen her yet. I told Mrs. Smith. I realized it, because I had thrown out my arm to catch her. She was expecting a baby and I was afraid she would hit the steering wheel. (R. 295)

\* \* \* \* \* \*

"Q. Now, did Mrs. Steele come down to your car, I mean where you were? A. Yes, sir.

"Q. What was her attitude and demeanor when she got there? A. She was telling that she was sorry and she didn't see the stop-sign, and could she do anything." (R. 297)

And on cross-examination, she was asked and answered as follows:

"Q. Then the car in which you were a passenger was struck, and you were concerned about Mrs. Smith, and you grabbed her by the arm? A. I threw my arm in front of her, to hold her.

"Q. To keep her from going forward? A. From hitting the steering wheel.

"Q. It happened very quickly? A. Yes, sir, that is right.

"Q. And you knew that Mrs. Smith was pregnant at the time? A. Yes, sir.

"Q. You were concerned about her welfare? A. Naturally. (R. 303)

＊　　＊　　＊　　＊　　＊　　＊

"Q. Mrs. Holcomb, you are telling us—I believe you have stated on your direct examination by Mr. Cox, that a moment or two after the impact that Mrs. Steele came to the car you were in and stated that she was sorry, that she didn't see the stop-sign? A. She did say—

"Q. And that she was talking to her mother-in-law? A. I don't remember that, but I remember her saying she didn't see the stop-sign.

"Q. Didn't you tell Officer Pennick she said that? A. I can't say for sure, but I do know she said, 'I didn't see the stop sign,' and she said the girl and mother-in-law were in the car.

"Q. You did hear someone say that she was talking with her mother-in-law, but you don't remember who it was that said that? A. That is right. (R. 305)

\*     \*     \*     \*     \*     \*

"Q. Mrs. Holcomb, you wouldn't deny that you told Officer Pennick that Mrs. Steele said she didn't see the stop-sign and was talking with her mother-in-law at the time? A. I don't remember about the mother-in-law. I remember her saying, distinctly, 'I did not see the stop-sign. I am just as sorry as I can be. Can I do anything?' Then I explained to her that Mrs. Smith was pregnant.

"Q. You wouldn't deny that you made the whole statement to Officer Pennick, you are not denying it? A. I won't deny she may have said she was talking, but I don't remember anything except the mother-in-law and little girl were in the car. (R. 306-307)

\*     \*     \*     \*     \*     \*

"Q. You also told Officer Pennick that Mrs. Smith had no way of avoiding the accident, that the accident was not her fault? A. Well, she didn't hit Mrs. Steele; Mrs. Steele hit us.

"Q. You did tell that to Officer Pennick? A. Maybe.

"Q. Tell us what you mean by that? A. Well, I may have said that she couldn't have avoided it, because Mrs. Steele ran the stop-sign and hit us in the middle of the intersection.

"Q. You told him it wasn't Mrs. Smith's fault? A. It wasn't; she didn't hit Mrs. Steele." (R. 308)

The last four questions and answers are quoted in the original motion for a new trial made by plaintiffs. (R. 397)

Mrs. Mary Wright, mother of Mrs. Smith, was a witness for plaintiffs and testified for plaintiffs in their proof in chief. That testimony related only to the physical condition of her daughter and she was not cross-examined. She was recalled as a witness in rebuttal, asked and answered one question:

"Q. I will ask you if at any time since this accident Mrs. Holcomb stated to you, or in your presence, that your daughter, Mrs. Smith, had nothing to do with the accident?

"A. She did." (R. 341)

The record shows that Mr. Cox, counsel for defendants, simply stated to the Court:

"Mr. Cox: Your Honor, that has nothing to do with rebuttal.

"The Court: That is not rebuttal.

"Mr. Aspero: (To the witness) Come down, please." (R. 341)

So it appears that no direct objection was made and the Court did not exclude that statement, simply having observed: "That is not rebuttal."

A witness, one Mrs. Dolores Pruette, a photographer, was called by plaintiffs and asked about a conversation in her studio between the plaintiff Mrs. Smith and the witness Mrs. Holcomb, which occurred in March, 1954, while Mrs. Smith and Mrs. Holcomb were in her studio together. She was asked the direct question:

"Q. What did you hear said, and from whom?

"A. Well, from both of them, that the other lady had run a stop-sign and hit the car that Mrs. Smith was driving. I think the most interesting statement of the conversation was made by Mrs. Smith, who said she wished she had been going her full thirty miles an hour. The lady—" (R. 352)

At that point, an objection was made that the evidence was not competent, whereupon the Court observed that it was a self-serving declaration and sustained the objection. Mr. Aspero, counsel for plaintiffs, then said: "I did not know it was coming either". And he then asked the following question of the witness:

"Q. Was there any disagreement between them as to how the accident happened?"

Objection was again made and Mr. Aspero withdrew the question and excused the witness. (R. 353)

So it is obvious that the evidence sought to be used, as related in the affidavit of Mrs. Bell, was purely cumulative.

■ Now it also appears that the alleged newly discovered evidence could only be competent to contradict certain bits of testimony of the witness, Mrs. Holcomb. Newly discovered evidence that is merely cumulative, or such as can have no other effect than to discredit the testimony of a witness at the original trial, contradict a witness' statement, or impeach a witness, unless the testimony of the witness who is sought to be impeached, was so important to the issue and the evidence impeaching the witness so strong and convincing that a different result must necessarily follow, is not sufficient to justify the Court in granting a new trial, upon proper application therefor. Vest v. Bitner, 34 Tenn. App. 575, 583, 241 S. W. (2d) 438; Gentry v. State, 184 Tenn. 299, 310, 198 S. W. (2d) 643; Noel v. McCrory, 47 Tenn. 623; Demonbreun v. Walker, 63 Tenn. 199, 204; McGavock v. Brown, 23 Tenn. 251; 39 Am. Jur., New Trial, Sec. 167, p. 173.

■ The granting of a new trial on grounds of newly discovered evidence of a contradictory and impeaching character, is within the sound discretion of the Trial Court. Zirkle v. Stegall, 163 Tenn. 323, 43 S. W. (2d) 192; Darnell v. McNichols, 22 Tenn. App. 287, 122 S. W. (2d) 808; Vest v. Bitner, supra, 34 Tenn. App. at page 584, 241 S. W. (2d) 438.

Certainly under the circumstances shown by this record, there has been no abuse of the discretion exercised by the Trial Judge when denying the motion for a new trial upon the alleged newly discovered evidence, and Assignment of Error VI must be overruled.

■ Under Assignment of Error V, plaintiffs insist that the physical facts shown by the photographs and

produced by-the proof, are such that conclusively prove, as a matter of law, there was no contributory negligence on the part of plaintiff Elsie B. Smith and insist that the Court should have discarded the entire testimony of Mrs. Holcomb relative to plaintiff's failure to avoid the collision, because her testimony is inherently impossible under the physical facts, and by this Assignment undertake to make the ''physical facts rule'' applicable to this case. This Assignment is overruled.

While it is true that Mrs. Steele testified that she did not see the stop sign and moved her automobile into this intersection without stopping, we think the physical facts shown by the photographs and testified to by the witnesses, indicate very strongly the truthfulness of Mrs. Holcomb's statement that Mrs. Smith could have avoided the accident by steering her car slightly to the right. Mrs. Steele applied her brakes—that is positively proven and shown by the photographic physical facts. It is also proven that only the front end of her automobile ever reached and crossed the center line on Overton Park Avenue. Evidently the jury believed that Mrs. Smith did not see Mrs. Steele's car until the impact, just as testified to by Mrs. Holcomb, and reiterated in her statement to Mr. Holcomb at the scene and in his drug store. From the proof and exhibited physical facts shown by the photographs, it appears that while Mrs. Smith was passing through the intersection, she was to the right of the center line on Overton Park Avenue had that center line extended clear through the intersection as shown by the white strip, but evidently the left side of her automobile was near this center line before and at the time of the impact, leaving a considerable space on the Avenue to her right. Her automobile, as

shown by the photograph, Exh. 6 to the testimony of Officer Pennick, shows that the center of the impact was approximately in the center of the left side of her car, but giving full consideration to the damage shown by said photograph to have resulted from the impact on the side of her car, Mrs. Steele could not have been traveling at anything but a very slow speed when the impact occurred. Had Mrs. Steele been traveling at a fast speed, the Smith car would have been crushed far more than that which did occur. There is no just or legal reason for the employment of the "physical facts rule" in this case, regardless of the fact that there is what is referred to as a blind corner at this intersection.

■ Only when the testimony introduced by a party to a suit or by a witness is shown by the physical facts and surroundings to be absolutely untrue, or when it is so inherently impossible that no reasonable person would accept it as true or possible, the Circuit Judge should take the case from the jury, notwithstanding the fact that there may be some testimony tending to show otherwise. Oliver v. Union Transfer Co., 17 Tenn. App. 694, 698, 71 S. W. (2d) 478; Southern Railroad Co. v. Hutson, 170 Tenn. 5, 91 S. W. (2d) 290.

■ Testimony is not destroyed by conflicting testimony regardless of how fully supported, when the test is that of the credibility of the witness. The improbability of the truth of the testimony, which justifies rejection under the "physical facts rule", cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses. Southern R. R. Co. v. Hutson, supra.

Neither can the "physical facts rule" apply when it is necessary to *estimate distances or measurements,* or to start with the assumption of the existence of any fact, and certainly not when the testimony is consistent with the physical facts. Southern Railroad Co. v. Hutson, supra; Duling v. Burnett, supra; Waller v. Morgan, 23 Tenn. App. 355, 358, 133 S. W. (2d) 614, 616.

This brings us then to the only other question made by the Assignments of Error, which is brought forth in Assignments I, II, III, and IV, and relates to the assertion that the verdict is so grossly inadequate as to evince passion, prejudice, corruption, and unaccountable caprice or compromise on the part of the jury. This is a serious question in this case.

It is insisted by plaintiffs that while plaintiff Elsie B. Smith did not sue for hospital bills, doctors' bills, etc., only having brought suit for personal injuries, including the elements entering into a personal injury, pain, suffering, etc., that the verdict in her favor of only $550 indicates that the jury was compensating her only for such expense items. They insist that the fact that plaintiff L. Kenneth Smith, who sued for the damage to his automobile, the amount of his expenditure for medical and hospital care of his wife and for loss of personal service of his wife, showed that the jury by its verdict of only $375 undertook to compensate him for the damage to his automobile, and that the total of the two judgments for plaintiffs so clearly and nearly approximate the total of the medical and hospital expense and the damage to the automobile, that any other conclusion is inescapable, and therefore, that the respective verdicts are wholly inconsistent with the issues made by the pleadings.

It is further insisted that the injuries to Mrs. Smith were so severe, as shown by her own testimony and that of the physicians who treated her, that the verdict in her behalf is greatly inadequate and evinces passion, prejudice and caprice on the part of the jury. They insist that because of the loss of time in her work in the business of her husband, the loss to him of her personal services as a wife and in the home, are such that the verdict in his behalf was arrived at under the same influence.

Such cases present problems for an appellate court which must not overlook the fact that where the record shows a fair and impartial trial, no lack of patience on the part of the Trial Court to give each party an ample opportunity to develop their respective theories and introduce all the proof on the respective issues competent in such cases, and that he sits as a 13th juror, seeing the witnesses as they testify, observing their demeanor in giving such testimony, the attitude of the witnesses toward the Court in trying to present to the Court the whole truth, or the reverse, and their willingness to make admissions which are calculated to be against their interests, and where the evidence is conflicting, appellate courts must be exceedingly careful in trying to analyze the mental reactions of the jurors so as to arrive at a conclusion that their verdict was one of partiality, passion, malice or caprice. Particularly is this true where the evidence is such as to require the Trial Court to submit to the jury the question of remote contributory negligence or contributory negligence by plaintiff that did not proximately contribute to the injury, and if found to exist by the jury consideration be

given thereto in arriving at the amount of the recovery or verdict for plaintiff.

Let us look first at the alleged expense incurred for damage to the automobile of Mr. Smith, and the medical, hospital and physicians' expense incurred by him in connection with his wife's injury. The proof substantiates the statement of facts by plaintiff to the effect that the damage to the automobile was $335.95. The verdict of the jury in favor of Mr. Smith exceeded that amount by $40 (R. 143) Mr. Smith's expense for hospital, physicians, ambulance and Thomas collar brace, amounted to $568.30. (R. 143) The verdict in favor of Mrs. Smith was $18 less than the aforesaid total items of expense incurred by Mr. Smith. One of these items of medical expense is the account of Dr. Rudolph McCormick, as shown by his testimony to be in the amount of $200 for services to Mrs. Smith growing out of her injury. (R. 219, 220) There is, however, in the record an exhibit, which is an itemized statement of Dr. McCormick's charges apparently made up by him dated September 1, 1954, showing his account from March 22, 1954 to June 28, 1954, to be only $50, Exh. 1 to cross-examination of Dr. McCormick. This account shows $20 for two X-ray pictures and 10 office visits at $3 each. While Dr. McCormick has testified that his charges for services were $200 to the date of the giving of his testimony, he admitted on cross-examination that he had no record of having made any other book entry of his charges except those shown by the exhibit. When shown the exhibit, he spontaneously broke in with the statement:

"I know what you are trying to drive at. I have seen a whole lot of patients where I never make a charge and don't put them down in the office books; but I saw Mrs. Smith every day for two weeks, with the exception of Sunday, after the operation. That is all I have to say." (R. 222)

He later explained that he meant instead of "after the operation" to say "after the accident". This witness was quite positive about his findings, prognosis, and the injury to Mrs. Smith. He admitted that he had never performed an operation such as is performed by neurosurgeons and stated that he was a baby specialist and a medical man. (R. 222) He testified on direct examination that he was a neurologist, and in both direct and cross examination he said he was not a neurosurgeon. He destroyed his X-ray films and had no picture from them. He said there were no broken bones revealed by the X-rays. He first recommended to Mrs. Smith a treatment of hot applications, rest and a sedative. Later he advised ultra-violet treatment, which she took in his office. He gave her injections of Vitamin B12 and Vitamin B1, which he explained were helpful in a nervous type of disability or injury. He explained that he observed expressions on the face of his patient, made examination of musculature contraction and muscular tenseness in the arm, which did not relax without sedative. Though he had thrown his X-rays away, he explained that in them he could see no abnormalities of any nature at the time they were made three days after the accident. His first diagnosis was "musculature contraction" of the left side and about the back and neck, radiating down into the arm, and after about three weeks some suspicion of a ruptured disc. By "musculature contraction" he ex-

plained that he meant "sprained ligaments". He was shown X-ray photograph of the spinal column of Mrs. Smith and stated that her spinal column did not have the proper curvature, that it had straightened, and that she had a ruptured disc. The plaintiff Elsie B. Smith was referred to a neurosurgeon, Dr. Donald A. Johnson, after her baby was born and about four months after the injury.

Dr. Donald A. Johnson, a qualified neurosurgeon, graduate of George Washington University, Member of the American Board of Neurology and American Board of Neurological Surgery, gave his deposition in these cases on the 24th day of May, 1955. He first saw Mrs. Smith on the 28th day of July, 1954 at his office, 1092 Madison Avenue. She told him of the automobile accident and explained her injury. He first saw her about three weeks after an uneventful birth of her baby. She gave him the history of having had treatment by some other physician but without complete relief. She complained of pain in her left shoulder and over her left scapula, with no discomfort at that time in either the right or left arm. His examination showed general muscular tenderness at the top and both sides of the shoulders, with more tenderness on the left. Her neck motions and movements were not then restricted and he felt that the major difficulty was in the muscles of the shoulders and neck on both sides rather than in the spine itself. He prescribed certain exercises and requested her to return in three weeks. He next saw her on August 11, 1954 and she was somewhat improved but still complaining. He again examined all the muscles on both sides of the shoulders and found them moderately tender as appeared when he first saw her. He added to her exercise the use

of moist heat and asked her to return in about two weeks. This treatment was administered by the application of hot water bottle and hot wet towel on the shoulder area. He instructed her that she was in no danger in continuing with activities necessary to her housework, feeling that she would be able to carry on her housework, but other activities should be foregone. He did state that he had told her she would have difficulty in washing dishes, washing clothes, preparing meals and caring for the child. He stated that one in her condition, as he then saw her, should not lift heavy articles, none weighing over 25 or 30 pounds. (R. 158) He stated that Mrs. Smith complained of pressure in the head, blackouts, dizziness, or lack of balancing power. He saw Mrs. Smith on December 10, 1954, at which time she was still complaining, and advised her that she should be hospitalized in view of the fact that she had not shown much progress over the five months period. She was not hospitalized that day but two days later she was. Her exercise was decreased and for a time she was placed in cervical traction with bed rest, heat and massages to her neck and shoulders. This traction, he explained, would hold the neck up, and with the rest and traction he felt like she would have a maximum chance to recover from the inflammation making her muscles tender and sore.

He stated that inasmuch as the X-rays made by Dr. McCormick had been destroyed, he requested other X-rays and they were made at the Baptist Hospital December 7, 1954. Pictures of these X-rays are made exhibits with this record. He stated that he was not a radiologist but his own particular interpretation of the X-ray was that the cervical spine had been straightened and that there was some narrowing of the 5th interspace.

He drew a line on the X-ray photographs showing how the spine had been straightened from its normal cervical condition of a posterior curvature, and which he said was the result of, or meant muscular spasms resulting in moderate pain in the neck. (R. 165) He was of the opinion that the findings shown by these X-ray pictures were consistent with the pain of which Mrs. Smith complained, and also consistent with his findings on physical examination.

Mrs. Smith was dismissed from the hospital December 21, 1954, having been hospitalized three days short of two weeks. A summation of his opinion and diagnosis may be found on page 170 of the Record as follows:

"I am certain that Mrs. Smith had at least a moderately severe injury to the neck and ligaments involving the neck, and certainly in the reparative process of this injury the formation of scar tissue is necessarily involved."

After her release from the hospital, she was seen in his office on January 17, 1955, and stated that she was considerably improved and doing her exercise program at home. She was seen in his office again on January 31, 1955, at which time the discomfort in her arms had moderately improved. At that time she was free from discomfort in her arms and sleeping somewhat better, but complained of discomfort in her shoulders and neck. He prescribed a Thomas collar for her which was fitted at Campbell's Clinic. He never saw her after January 31, 1955.

On cross-examination he stated that if the x-rays made by Mrs. Smith's first doctor had been available,

they would show whether or not she at that time had a loss of the curvature in the neck, or narrowing of the interspace. He also stated that many people who were otherwise normal and who do not know of it have straightening of the curvature of the neck or loss of lordosis, which is produced by a number of different causes. (R. 179, 180) He repeated that when he first saw her she complained of pain in the area of her left shoulder and shoulder blade, but made no complaint that it had radiated into her left arm. With respect to her injury, he made two statements which explain fully his opinion:

"Q. What was your opinion at that time, doctor?

"A. That the patient had a whiplash injury with the residuals thereof in the form of muscle tenderness in her shoulders, in the base of her neck, by that I mean she had an inflammation in the muscles at the base of the neck and in the shoulders causing her pain. It was my feeling at that time, as we have just reviewed, that the spine of the neck itself was not the primary or major site of any significant injury." (R. 182)

On re-direct examination, he said:

"It was my opinion on my initial examination that the motion of the neck was within normal limits with respect to the spine itself and therefore probably no direct spine injury had occurred. There was, however, tenderness over the shoulders and in the muscles of the shoulders on both sides which indicated muscular or ligament injury." (R. 186)

Dr. C. D. Hawkes, Associate Professor of Neurology and instructor in Neurosurgery at the University of Tennessee Medical School, specializing in neurosurgery and a Fellow of the American College of Surgeons, testified that he first saw Mrs. Smith on March 2, 1955, who gave him the history of having had an automobile accident in March, 1954, in which she was injured. She explained her pain, told him the treatments she had had, and that because of developed pain in the neck and shoulders and numbness in her left arm, she had consulted a physician, taking simple measures until after the birth of her baby, and that she then saw Dr. Johnson in July of 1954. She explained that she had had treatments with Dr. Johnson and, after his examination, Dr. Hawkes stated:

"I found that Mrs. Smith was obviously nervous, tense and apprehensive. She had tenderness through the muscles of that shoulder and felt tenderness in the neck at that time. There were no changes in the reflexes or in the strength of the extremities. I felt that she had had a musculature and ligamentous strain of the neck and back, and that she had been a good deal nervous and concerned over the persistence of symptoms which may occur for some time in these cases, and that that was part of what was wrong with her." (R. 231, 232)

He suggested to her the continuation of exercise, rest and sedative, as had been prescribed to her by Dr. Johnson. Dr. Hawkes made an encephalogram and brain wave test, because Mrs. Smith had said she felt giddy and would blackout. These tests showed the normal brain wave pattern, and after making the test it was his feeling that this was the result of nervous reaction to the injury.

He saw her about twice a month in six visits to his office. He stated that her symptoms and his findings varied several times and the painful symptoms continued, and on May 6, 1955, Dr. Hawkes had some x-rays made of her neck at the Baptist Hospital. She had had some x-ray films made in December of 1954 and Dr. Hawkes compared the two films in his explanation of her injuries. He stated that the film made in December, 1954 showed a narrowing of one of the spaces of the spinal column occupied by the disc and that the film made in May, 1955, or approximately five months later, showed a further narrowing of that space; that these films also showed some increase in the annulation of the spine. (R. 232, 233) These additional findings by Dr. Hawkes led him to the conclusion, and he so testified, that they

"* * * made me believe that in addition to the strain of the muscles of the neck, she also had some injury to the disc, in particular, the gristle material between the bones of the spine. There certainly appears to be some degeneration in this inter-space. I have felt that she may still get by with conservative measures. We contemplated the necessity for actual recourse to operative treatment, because of the progression of the condition in the neck." (R. 233)

With that statement, he then stated that he considered her disability to be about 30%, but with long-time continued treatment he felt she would have a "permanent disability of about twenty percent". He pointed out to the Court and jury from the photographic exhibits the things which indicated to him a disability such as he described. Dr. Hawkes further stated that when she came

to him she was wearing a Thomas collar brace which he gradually got rid of. This was explained to be a collar which placed traction on the neck and calculated to permit strained or injured muscles to take normal places. He explained how a ruptured disc would push up against the nerve causing pain and when an operation was performed to remove that condition, about what length of time it would be necessary for treatments both before and after the operation, and fixed the convalescent period at "several months". (R. 242) He was of the opinion that the operation would be necessary and in giving the technical name of the operation stated that it would be a "partial laminectomy". (R. 240) He estimated the surgical fees and subsequent care at $350.00 and the other costs at approximately $400.00. He fixed the time to obtain maximum improvement from six months to one year. (R. 246)

On cross-examination, Dr. Hawkes testified that in the absence of the history of some physical injury known to the patient, it would be uncommon to find a condition existing like this in the neck of Mrs. Smith. He further explained that the evidences of the injury would not appear within a few days thereafter, and that it might be a number of days and sometimes weeks, before the injured portion of the disc will "wiggle its way around, and when you get the nerve pinched it will commence the action". (R. 251) He also explained that a ruptured disc was an injury different from that usually referred to as a "whiplash". He explained further that the fact of litigation might cause nervousness and retard recovery.

The substance of Mrs. Smith's testimony with respect to her injury, pain, suffering, treatment in hospital and by physicians, is that she was so hurt and shocked that she had to be transported to the Baptist Hospital immediately after the accident. She was five months pregnant and feared damage to her unborn child. She had severe pain in her shoulders and back and was extremely nervous. The pain in her neck, back and shoulders increased and she was treated with injections of Vitamin B1 and Vitamin B12, ultra-violet ray, sedatives and hot applications. The baby was delivered at 8 months. The pain extended from her shoulders down her left arm. She had blackout spells lasting 30 to 40 minutes. She was confined in Baptist Hospital from December 12, 1954 to December 22, 1954, where she had head halter traction, heat and massage treatments to her neck and shoulders. Pain relieving drugs were prescribed and administered during her hospitalization and at home. A Thomas collar brace was adjusted to her neck, under her chin and back of her head, which she wore for about three months. She still suffered the pain in her arm in June, 1955. The pain in her arm extended down into her fingers. She was cared for by Dr. Rudolph McCormick during the first few months after her accident. She was next in the care of Dr. Donald A. Johnson until January 31, 1955, and from then on she was in the care of Dr. Hawkes.

As evidenced by Dr. Hawkes' testimony, he advised that she should have a major surgical operation on her spine, known as a laminectomy, and which would remove the disc or part thereof pressing against the nerve causing her pain; that this operation would confine her at the hospital approximately two weeks and the convalescence period would be several months.

Photographs of her spinal column have been introduced, as hereinbefore stated, which indicate an abnormal straightening of the spinal column.

It must be an admitted fact that if the physical condition of Mrs. Smith was as revealed through the long period of treatments from March, 1954 up until the date of the trial in 1955, and if she was guilty of no negligence which remotely contributed to her injury, justifying the jury in fixing a much smaller recovery than she would have been otherwise entitled to, coupled with the fact that the judgment and verdict in favor of Mrs. Smith so closely approximate the expenditures by Mr. Smith for her physicians, hospital confinement, and treatments, all of which he sought to recover in the case brought by him, the amount of the judgment in her favor would be so inadequate as to indicate misconduct of the jury, such as prejudice, passion, sympathy and caprice, or of mistake, misapprehension or oversight, on the part of the jury, which would justify this Court in so holding and setting aside the verdicts of the jury and the judgments of the Court thereon.

Over and against such thought, however, there are:

(1) Outstanding differences of opinion between Dr. Johnson and Drs. McCormick and Hawkes, with respect to the severity of the injury to Mrs. Smith; and

(2) The testimony, facts and circumstances surrounding the collision are such, as heretofore stated, as justified the Trial Court in charging the jury with respect to the effect of contributory negligence which did not proximately produce the injury, affecting the amount of recovery.

This Court in an Opinion by Judge Swepston, now a Justice in the Supreme Court of this State, in the case of Board of Mayor & Aldermen of Covington v. Moore, 1950, 33 Tenn. App. 561, 232 S. W. (2d) 410, 413, laid down the rule followed in this State with respect to complaints which relate to the amount of the verdicts and judgments. In that case, it was said:

"Where the complaint relates to the amount of the verdict—either for excessiveness or inadequacy, the appellate court will weigh the evidence, not merely to determine the bare preponderance, but to determine whether the evidence so greatly preponderates against the amount found as to show passion, prejudice or unaccountable caprice. The court will not reverse unless it appears that the amount of the verdict was affected by, or resulted from such prejudice, etc. It is not enough merely that the trial judge or the appellate court opines that the amount was too large or too small. Burckell v. Memphis Street Ry. Co., 2 Tenn. Civ. App. 576, 584 and cases cited, especially Tennessee Coal & R. Co. v. Roddy, 85 Tenn. 400, 404 et seq., 5 S. W. 286."

In a later case, that of Flexler v. Crawley, 37 Tenn. App. 639, 269 S. W. (2d) 598, 600, this Court in an Opinion by Judge Carney, following the Opinion in the case of W. T. Grant v. Tanner, 170 Tenn. 451, 95 S. W. (2d) 926, and the text in 39 Am. Jur., New Trial, Sec. 147, p. 153, with respect to cases involving alleged inadequate verdicts and judgments, approved the following rule:

"It is generally recognized that the court may order a new trial in an action for personal injury where the smallness of the award induces the convic-

tion that the verdict was the result of mistake, misapprehension, oversight, or misconduct such as passion, prejudice, or partiality, on the part of the jury. Relief will be granted where the finding is 'grossly' inadequate and the compensation given entirely disproportionate to the injury which is proved to have been sustained, or when it appears, upon the facts proved, that the jury must have omitted to take into consideration some of the elements properly involved in the plaintiff's claim * * *''

It is true that in the Flexler case we set aside the verdict of the jury and judgment of the Court and ordered a new trial because the verdict was '' 'grossly' inadequate and the compensation given entirely disproportionate to the injury'' sustained by the plaintiff in that case, particularly in view of the fact that the evidence showed no possible contributory negligence of any character and the charge of the Court did not contain any reference to the definition of remote contributory negligence.

We also referred to the Opinion in the case of High v. Lenow, 195 Tenn. 158, 258 S. W. (2d) 742, 745, in which case the Supreme Court was asked to follow the same rule laid down in Grant v. Tanner, supra, and we referred to the fact that the Supreme Court merely differentiated between the two cases but did not overrule or disapprove the rule in Grant v. Tanner. In High v. Lenow, supra, plaintiff sought a recovery for damages of breach of a contract specific in its nature and in which suit the damage sought to be recovered was $200 per unit on 49 housing units, or $9,800. The jury returned a verdict in favor of plaintiff for only $5,800. It is noted that the

case of High v. Lenow was tried before the same learned Trial Judge who presided at the hearing of the instant case. The distinguished and late lamented Judge Anderson, in an opinion for this Court, reversed and remanded the case upon the theory that the verdict was such as showed a pure compromise by the jury. The Supreme Court granted certiorari, reversed the Court of Appeals, and sustained the action of the Trial Court in approving the verdict and entering judgment thereon.

While the case of High v. Lenow is not parallel with the instant case, in that Opinion, referring to the fact that the jurors might have had different opinions in the beginning of their consideration of the issues, the Court said:

"The jury should not go contrary to their convictions but they should properly give heed to the opinions of their fellow jurors, and by reasonable concessions reach a conclusion which although not originally entertained by any of them, nevertheless may be one to which all can scrupulously adhere."

It is the duty of the jury to receive the charge given by the Court as the law of the case. Wade v. Ordway, 60 Tenn. 229; McCorry v. King's Heirs, 22 Tenn. 267. It is also the duty of the jury to determine the facts of the case from the evidence given upon the trial and that alone. Citizens St. Ry. Co. v. Burke, 98 Tenn. 650, 40 S. W. 1085. The jury then applies the facts to the law and arrives at their verdict. If the jury fails in either instance, the Trial Court should not let the verdict stand. However, in a case where the extent of the personal injury is involved for which recovery is sought, and the extent of that injury may be properly

determined by the jurors from contradictory facts and evidence, and other facts of the case are such that the jury can apply the doctrine and principle recognized as proper by the courts of Tennessee, referred to as the "Remote Contributory Negligence Rule", when properly submitted to it by the proper charge of the Trial Court, and no other reversible error appears in the record, the appellate court should not reverse alone because of an alleged inadequacy in the amount of recovery fixed by the jury, either by determining that the verdict was a compromise or was the result of sympathy, passion, malice or caprice, mistake, misapprehension or oversight.

Commenting on Assignment of Error V, beginning on page 17 of this opinion, [313 S. W. (2d) 507], we have set out the pertinent facts shown by the record which made it necessary to charge the jury relative to the meaning and effect of remote contributory negligence. I will not further detail these facts. With respect to negligence, the **Court said**:

"If it is not direct and proximate, but only remotely contributes to bring about the injury, then under our law there could be a recovery, but you must diminish the amount of the award that you give the plaintiffs as damages by the degree of remote contributory negligence that you find the plaintiffs guilty of." (R. 367)

That was a correct statement of the law as we have it in Tennessee.

In the case of Southern Bell Tel. & Tel. Co. v. Skaggs, 34 Tenn. App. 549, 241 S. W. (2d) 126, the jury gave the plaintiff a judgment for personal injury, but not for property damage. There was a collision between plaintiff's Pontiac automobile and defendant's truck. The verdict in that case recited the following:

"We the jury find for the plaintiff $5,000.00 for personal injuries and $0 for personal property damage, C. D. Richards, foreman."

The Assignment attacked that verdict on the ground that it was inconsistent because no property damage was awarded. In passing upon the Assignment, this Court said:

"In the instant case, the defense of contributory negligence was vigorously pressed and, following the charge upon the question of remote contributory negligence, the jury may have found the plaintiff guilty of remote contributory negligence and mitigated its award of damages in the amount of the repair bill upon the car."

While the question of an inconsistent verdict is not necessarily an inadequate verdict, yet the rule respecting remote contributory negligence in the two issues is the same. Following that rule this Court in the unreported case of Campbell v. Hughes, opinion filed January 7, 1953, where there was an itemized verdict for automobile damage, ambulance, hospital, physicians service, and x-rays of $335, and its specific statement in the verdict "personal injuries none", we affirmed upon the theory that the jury evidently found the existence of remote contributory negligence on the part of plaintiff.

In the instant case the plaintiff-in-error, plaintiff below, first filed a statement of the case, assignments of error, brief and argument containing 99 pages and thereafter filed a supplement to same containing 59 pages. After the case was argued, there was forwarded to the Clerk of this Court a document entitled "Supplemental Propositions of law" of 7 pages. We have not undertaken to analyze or refer to each case mentioned in such voluminous documents. This Opinion is already far too long, but suffice to say that we are of the opinion that the jury, from the evidence before it, was of the opinion and found that:

(1) Mrs. Smith's injuries and her pain had been magnified in her statements to the physicians;

(2) She would not need surgery to correct the injury; and

(3) She was guilty of such remote contributory negligence that the recovery which she would otherwise have been entitled to, should be greatly reduced.

The jury must have also determined that the negligence of Mrs. Smith remotely contributed to her injury and the recovery which Mr. Smith would have otherwise been entitled to, was reduced.

All Assignments are overruled. Plaintiffs in error, plaintiffs below, and the sureties on their cost bonds, will pay the costs of this case in this Court. The judgments of the Lower Court are affirmed and judgments will be rendered here in accord with this Opinion.

Carney and Bejach, JJ., concur.

On Petition to Rehear

AVERY, P. J. (W. S.) In this case the Opinion was filed on August 23, 1956 and announced on that date as provided by law. Counsel for the parties prepared an Order or Judgment upon said Opinion, filed August 31, 1956, styled and designated: "Order on Opinion of Honorable Court of Appeals" and presented it to the Clerk, approved by counsel for both parties, the last paragraph of which is as follows:

"Plaintiffs in error are granted fifteen (15) days from the date of the entering of this order to take any legal steps that they deem necessary, usually required to be taken within ten (10) days, such as petition to rehear, etc."

On September 15, 1956, plaintiffs-in-error filed a petition styled and designated: "Petition to Rehear and to Vacate Judgment or to Certify for En Banc Hearing for Plaintiffs-in-Error".

Plaintiffs-In-Error now insist that by virtue of the above quoted provision in the Order or Judgment filed with the Clerk and oked by counsel for each of the parties, that Petition to Rehear is filed within the proper and allowed time.

Rule 22 of this Court permits the filing of petitions to rehear "within ten days after the opinion of the court is filed, except that, in cases decided within the last ten days of the term", etc. There is no provision in the law nor in the Rules of this Court authorizing an extension of such time. It may have the inherent right to extend the time for filing petition to rehear within a reasonable time beyond the ten days. However, counsel

for plaintiffs-in-error have assumed the position that because counsel for defendants-in-error agreed to and oked the Order or Judgment containing the above quoted provision, they were automatically granted such an extension without presenting it to the Court; but under Rule 19 of this Court it is provided that:

"Counsel may present decrees at any time when the court is not engaged in hearing a cause; but decrees about which counsel do not differ may be entered without being presented to the court."

That Rule then provides how such action may come about, but in no wise intimates that the rules of this Court may be set aside merely because counsel have agreed to it, and of course the true meaning of that Rule 19 hereinabove quoted, is that when a decree, based upon an Opinion of this Court, is agreed to and conforms thereto, it may be entered without being presented to the Court. Rule 19 has no such meaning as that the rules of this Court may be suspended in any way or extended in any way without permission of the Court.

It is true in this case that on the 30th day of August, 1956, a letter was addressed to the Presiding Judge of this Court, written by the firm of Aspero & Aspero, in which it is said among other things that Mr. W. C. Rodgers has been associated with the firm of Aspero & Aspero, and that "Mr. Allen Cox, Jr. has agreed, for the defendants-in-error, that we may be granted an extension of fifteen days from the entry of the Order affirming judgments within which to file a Petition to Rehear". In another paragraph of the letter, it is said that: "No doubt you have received this Order and we are confident that you will protect the rights of plaintiffs-in-error".

When that letter was written the Order or Judgment had not even reached the Office of the Clerk and did not do so until August 31st, as above stated, and was never mailed to or presented to any member of this Court. However, in view of the fact that such letter was written, we have given consideration to the argument advanced supporting the Petition to Rehear and each of the Judges of this Court has again examined the original Opinion, the briefs filed in connection with the Assignments of Error, the original Petition to Rehear, and the reply thereto filed herein on September 22, 1956, copy of which was furnished each member of this Court.

We have referred to Rule 22 and its provision with respect to the time allowed for filing petitions to rehear and to Rule 19 with respect to entering decrees where counsel for both parties have oked the same, and the effectiveness of such action to extend the time provided by the Rule for filing petitions to rehear, and this has been done so that the Bar may understand that a simple agreement by counsel for respective parties cannot suspend the rules of this Court in any regard.

The Petition to Rehear advances no theory or argument that was not advanced in the original Assignments of Error, Brief and Argument of plaintiffs-in-error, and if the petition as now filed could be considered a petition to rehear, it would be only upon the theory that the Opinion conflicts with the prior Opinion of this Court, unpublished, in the case of Charles W. Campbell v. C. S. Hughes, filed January 7, 1953, prepared by Judge Carney and approved by Judges Swepston and Avery, copy of which was attached to the Reply Brief of defendant-in-error filed in the instant case.

There is no necessity to refer to the facts in the case of Campbell v. Hughes, supra, and make any comparison with the facts in the instant case. There was considerable difference in the facts as set out in the respective opinions. However, insofar as the Opinion in the instant case affirms the judgment of the Lower Court, such conclusions are similar.

▇▇▇▇▇▇ The allegations in the petition now being considered for rehearing, or for the vacation of the judgment, or certifying this case for en banc hearing for plaintiffs-in-error, as related to the case of Campbell v. Hughes, do not justify this Court in granting the petition for either purpose.

Referring specifically to the application for en banc hearing by all nine members of this Court, which points out what petitioners aver is a conflict in the Opinion in the instant case, with that of Horne v. Palmer, 38 Tenn. App. 354-360, 274 S. W. (2d) 372, 374-376, it is not necessary to refer to the quotations from that Opinion other than the ones referred to in the petition now under consideration. In that case the Court said:

"Plaintiff Hanzy Horne testified that he was travelling at about 45 miles per hour when the Palmer truck pulled out in front of him too close for him to stop. From the foregoing we think there is permissible an inference that Horne was guilty either of proximate or remote negligence. The finding of some amount, small though it is, in his favor negatives a finding of proximate negligence, leaving remote negligence as the only possible jury finding against the Hornes.

"To understand the insistence of the plaintiffs that the verdicts are inconsistent and are compromise verdicts, it is necessary to quote at some length the remarks of the Court and jury when the jury returned to report its verdict:

" 'The Court: How do you find?

" 'The Foreman: Let Mr. Palmer pay the doctor bill and the hospital bill.

" 'The Court: You find for Hanzy Horne? What about Hanzy Horne?

" 'The Foreman: Well we just forgot about that.

" 'The Court: You can't forget about that.

" 'The Foreman: Can't we?

" 'The Court: You found for W. R. Horne, that is the father.

" 'The Foreman: No, just have the boy * * * let Mr. Palmer pay for the hospital bill and the doctor bill.

" 'The Court: Mr. W. R. Horne is the one who sues for the doctor and hospital bill.

" 'The Foreman: Well just change that.'

'After the Court appropriately charged the jury to return separate verdicts in the cases, the jury retired and after further deliberations offered to return verdicts dismissing the suit of the son and the cross action of Palmer and awarding $136, representing hospital and doctor's bills, in favor of W. R. Horne.

The Court properly declined to accept the verdicts as inconsistent and after further instructions from the Court the jury retired and thereafter returned the final verdicts of $75 in favor of each of the Hornes and dismissing the cross action.

"It is obvious from the foregoing that the jury was confused and, despite the diligent efforts of the Court, we think they either remained confused or set out to compromise the cases. Though wishing to dismiss the suit of Hanzy Horne, the jury apparently decided to deduct $75 from the hospital and doctor's bills and award that amount to Hanzy Horne so that the verdict in that case would not be inconsistent with a verdict in favor of the father."

\*     \*     \*     \*     \*     \*

"In these cases, in addition to the smallness of the verdicts, the record shows affirmatively that the jury was confused and the questions and remarks of the jury suggest that the only purpose in rendering a verdict in favor of Hanzy Horne was to make the verdict in that case consistent with a verdict of $75 in favor of W. R. Horne and yet not substantially exceed in both cases the hospital and doctor's bills. Yet, the trial court and this court cannot be sure what the jury intended. To review a verdict in such a situation presents a difficult problem and one which cannot be satisfactorily solved. We think justice can only be done by reversing and remanding both cases for a new trial."

While the facts in the cases are different to a considerable extent, it seems proper to further state that in the

instant case there is no statement by the jury showing that it was confused and certainly the Trial Court did not consider the jury to be confused and there is nothing in the entire record in the instant case which indicates that the jury undertook at any stage of the proceedings to change its verdict.

The application for a rehearing in this case, the application for vacation of the judgment and the granting to plaintiffs-in-error an en banc hearing before the entire Court of Appeals of Tennessee, is denied and the petition is dismissed.

Avery, P. J. (Western Section), and Carney and Bejach, JJ., concur.