IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 5, 2005

## STATE OF TENNESSEE v. SAMUEL T. CRAVENS

**Appeal from the Criminal Court for Fentress County**
**No. 8166      E. Shayne Sexton, Judge**

———————————

**No. M2004-01710-CCA-R3-CD - Filed August 25, 2005**

———————————

The defendant, Samuel T. Cravens, was convicted by a Fentress County jury of two counts of vehicular assault and one count of assault. The defendant argues on appeal that the evidence fails to support the convictions because the witness testimony upon which the convictions are based is inherently impossible and irreconcilable with the physical evidence and because the state failed to prove that the defendant's intoxication was the proximate cause of the victims' injuries. After thoroughly reviewing the record and applicable authorities, we find sufficient evidence to support the convictions and, therefore, affirm the trial court's judgments.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

John E. Appman, Jamestown, Tennessee, for the Appellant, Samuel T. Cravens.

Paul G. Summers, Attorney General & Reporter; Preston Shipp, Assistant Attorney General; William Paul Phillips, District Attorney General; and John Galloway, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

A two-car automobile accident gives rise to this appeal. The collision occurred at approximately 7:00 p.m. on July 5, 2001, in Fentress County. The accident scene was on Highway 127, north of Jamestown, on a stretch of the highway known as the "Hooper Hurst" curve. Judy Patton was driving northbound in a 1999 two-door Dodge Neon. She was accompanied by her granddaughter, 17-month old Mackenzie Duncan, and by a friend, Norma Stanley, both of whom were riding in the back seat of the vehicle. The defendant was proceeding southbound on Highway 127, driving a 1990 Oldsmobile. Fortunately, no one died as a result of the collision, but Ms. Patton and Ms. Stanley sustained serious bodily injury, and Ms. Patton's granddaughter sustained bodily injury. The defendant also was injured; a blood sample taken at the hospital and analyzed at the TBI

Crime Laboratory in Knoxville showed that the defendant's blood alcohol concentration was .17 percent. On September 14, 2001, the Fentress County Grand Jury returned a three-count indictment charging the defendant with two counts of vehicular assault, a Class D felony, *see* Tenn. Code Ann. § 39-13-106 (2003), and one count of assault by recklessly causing bodily injury to Mackenzie Duncan, a Class A misdemeanor, *see id.* § 39-13-101(a)(1).

At trial, Judy Patton testified that she was 54-years old and disabled, although she had worked previously for approximately 31 years. On July 4, 2001, she and her friend, Norma Stanley, babysat Ms. Patton's five grandchildren. The following day, the women planned a shopping trip. Ms. Patton took two of her grandchildren with them. The group had lunch and spent most of the day shopping in Crossville. On the return trip to Jamestown, Ms. Patton took the oldest grandchild home, bought take-out food for supper, and started driving to her home. Ms. Stanley was riding in the back seat behind Ms. Patton, and the youngest grandchild, Mackenzie, was buckled in a car seat on Ms. Patton's right side.

Ms. Patton testified that as she started "over the mountain" everything at that point was "just fine." She recalled that it had rained earlier, but she said that "the road was fine" and that she "always drive[s] slow going down the mountain with [her] foot on the brake." As Ms. Patton approached the Hooper Hurst curve, she saw a vehicle coming at her "all over the road." Ms. Patton related, "[H]e'd lost control that he had, and it was just everywhere. There wasn't [any]where for me to go. I just had time to pray." She explained that she could not maneuver to her left, and the placement of the guardrail made it impossible for her to maneuver far enough to her right to avoid the oncoming car.

After the vehicles collided, Ms. Patton was pinned in and could not open her car door. She said that people came to assist very quickly, and they cut the car door to remove her. Ms. Patton was flown by helicopter to the University of Tennessee Medical Center where surgery was performed on her hip and both ankles. Ms. Patton remained in the hospital approximately seven days, after which she spent seven weeks in a nursing home in Crossville undergoing therapy. The hip replacement proved unsuccessful, and Ms. Patton underwent a second hip replacement. After approximately six months, Ms. Patton was beginning to walk.

On cross-examination, Ms. Patton acknowledged that prior to the accident she was being treated for rheumatoid arthritis and that she was taking prescription Vioxx and Darvocet. She explained that she took the medication "early every morning and then when [she] went to bed at night." She insisted that at the time of the accident she was "clear as a whistle."

The defense questioned Ms. Patton about whether she tried to apply her brakes to avoid the collision. She answered that she already had her foot on the brakes coming down the mountain when she encountered the defendant. Ms. Patton said that she was unable to come to a complete stop before the impact. According to Ms. Patton, she was "busy watching the road," and if her granddaughter was crying, she did not notice.

Norma Stanley, who was the adult passenger in Ms. Patton's vehicle, testified briefly. Ms. Stanley did not see the defendant's car because she was attending to the baby who was crying. She felt the impact and afterwards was flown by helicopter to the Fentress County hospital where she was admitted to intensive care and treated for four broken ribs and multiple cuts and bruises. Ms. Stanley described her injuries, particularly her broken ribs, as "very, very painful."

Tennessee Highway Patrolman Kevin Norris, a "crash reconstructionist" assigned to the Critical Incident Response Team, was accepted as an expert in traffic investigation and accident reconstruction. Patrolman Norris was the first officer to arrive at the accident scene. He testified that the rear section of Ms. Patton's white Neon was resting upon and hanging over the guardrail. Ms. Stanley and the baby were outside of the car, but Ms. Patton remained inside because her car door was jammed and because she had "some fairly serious injuries to her legs." The defendant was also inside his vehicle, a gray 1990 Oldsmobile.

Patrolman Norris testified that the defendant was injured. A strong odor of alcoholic beverage emanated from the defendant's vehicle, and the patrolman observed several Budweiser beer containers inside the car. The patrolman radioed the sheriff's department and requested that an officer meet the ambulance that was transporting the defendant to the hospital and have a blood sample taken from the defendant. Officer Gary Ledbetter responded, and he later delivered a blood alcohol kit, containing two tubes of the defendant's blood, to Patrolman Norris. Patrolman Norris explained that he sealed the kit, initialed it, and transported it to the Knoxville Crime Lab for analysis.

In terms of his accident scene investigation, Patrolman Norris recounted that he took numerous photographs of the scene. He identified the photographs and explained what each one depicted. He found no evidence of skid marks associated with either vehicle, and he described the road condition as slightly wet from an earlier rain shower. Patrolman Norris took measurements at the scene that he subsequently entered into a computer program. He explained that the computer program "plots" the points that have been measured and generates a drawing of an accident scene.

Patrolman Norris explained the computer drawing of the accident scene at issue. He testified that the point of impact was "2.75 feet west of the east fog line" in the northbound traffic lane – Ms. Patton's lane of travel. The shoulder for the northbound lane was not wide enough to accommodate a vehicle. He found no evidence of an evasive maneuver by the defendant's automobile, and in his opinion, the collision occurred entirely in the northbound lane. As part of his investigation, Patrolman Norris also checked the vehicles for mechanical defects, and he said that neither vehicle had any such problems.

On cross-examination, Patrolman Norris testified that he determined the point of impact based on where the pavement had been gouged. He also tested the brakes on both vehicles and concluded that the brakes had not been applied on either car. The defense established that Patrolman Norris had no engineering or physics training and, consequently, did not perform any force or momentum calculations. Regarding the beer can in the front passenger floorboard, the

patrolman testified that the can was empty but then revised that testimony when reminded that he had testified at the preliminary hearing that the beer can was full and unopened. As for beer bottles in a cardboard container in the back seat floorboard, Patrolman Norris recalled that most of the bottles were broken but that the caps were on some of the bottles. He conceded that the alcohol smell could have been from the broken bottles rather than from the defendant.

Ms. Patton's daughter, Wanda Duncan, testified that she was on her way to Jamestown when the accident occurred and that her 17-month old daughter was with Ms. Patton. As Ms. Duncan proceeded up the mountain toward Jamestown, she came upon the wreck and saw that her mother, her daughter, and her mother's friend had been involved. Ms. Duncan parked her vehicle and checked on her mother, who was pinned inside the Neon. Fortunately, Ms. Duncan's daughter had no serious bodily injuries.

Fentress County Deputy Gary Ledbetter was the officer who responded to Patrolman Norris's request for a sample of the defendant's blood. Deputy Ledbetter testified that he proceeded to the hospital where he sought out hospital personnel to draw a blood sample from the defendant. Deputy Ledbetter was present and witnessed the procedure. The lab technician marked and initialed the tubes containing the blood sample, filled out the required forms, and gave the tubes to Deputy Ledbetter. Later that same evening, Deputy Ledbetter delivered the blood sample to Patrolman Norris.

TBI toxicologist Dave Ferguson performed the blood alcohol analysis on the defendant's blood sample. He testified that the results of his analysis showed that the alcohol concentration in the defendant's blood was .17 percent.

The defense offered testimony from Lana Cooper who was with a friend in the emergency room at the Fentress County Hospital when the defendant was admitted. Ms. Cooper was acquainted with the defendant, and she testified that he appeared coherent, albeit in pain, and she could not recall smelling any alcohol on him.

The defendant testified in his own behalf. On July 5, earlier in the day, the defendant and Stacy Choate had visited with a mutual friend. Choate, whom the defendant characterized as "pretty drunk," began wandering around, and the defendant decided to drive Choate home. Choate lived in Jamestown, but he persuaded the defendant to drive him to his girlfriend's house. The defendant said that on the way he stopped and purchased a six-pack of bottled beer. Choate, according to the defendant, had taken three or fours cans of beer from the friend's house when they left.

The defendant testified that he drove to the girlfriend's house, and he and Choate sat in the vehicle and drank a beer while waiting on Choate's girlfriend to arrive. Once she arrived, the defendant left. The defendant said that rain was misting off and on as he drove up the mountain. He recalled driving into Hooper Hurst curve, and he testified that he saw a vehicle coming at him. According to the defendant, the driver of the other vehicle was turned around, looking in the back

seat. The defendant said that he tried to get out of the way, and he described his actions as follows: "I mashed my car all the way to the floor [referring to the gas pedal] trying to veer off . . . out of the way. And I went over in this little paved ditch . . . . And when I went over in there, my car swerved and we hit, and my car swerved and went out of control. I think I hit them twice[;] I don't know for sure."

The defendant did not attempt to apply his car brakes; instead, he accelerated the vehicle. The defendant disputed Patrolman Norris's opinion that the point of impact was in Ms. Patton's lane of travel. The defendant claimed that Ms. Patton was driving over into his lane, and he said that he reacted by turning away from Ms. Patton's vehicle and trying to "get down to the ditch line."

Asked about the bottled beer in his vehicle, the defendant said that all five remaining beer bottles were full. The defendant recounted that from 8:00 a.m. on July 5 until the time of the accident, he had consumed three 12-ounce bottles of beer. The defendant believed he was capable of driving that afternoon, and he adamantly denied crossing the centerline into Ms. Patton's lane of travel.

On cross-examination, the defendant initially insisted that the collision occurred in his lane of traffic. He later retracted that contention and admitted, "I think it was in my lane. I don't know for sure. I don't know for sure where we collided. To tell you the truth, it happened so quick, I didn't know what happened." Regarding possible witnesses to the defendant's condition during the day, the defendant agreed that he had not subpoenaed Choate, the friend that he had visited before the accident, or Choate's girlfriend.

At the conclusion of the defendant's testimony, the defense rested. The state recalled Patrolman Norris and asked if he had found any evidence that the vehicles collided in the defendant's lane of traffic. Patrolman Norris responded that he had not and that all of the debris from the collision was in Ms. Patton's lane of travel. Based on the condition of the vehicles and where they came to rest, Patrolman Norris also disputed the defendant's claim that a secondary impact occurred.

After deliberating and considering the evidence, the jury found the defendant guilty of vehicular assault relating to Ms. Patton, vehicular assault relating to Ms. Stanley, and assault relating to Ms. Patton's granddaughter. The defendant timely appealed and challenges the sufficiency of the convicting evidence.

Our evidence-sufficiency review is conducted pursuant to well-settled principles. When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

In determining sufficiency of the proof, the appellate court does not replay or reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). Simply stated, the reviewing court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As we understand the first part of the defendant's argument, he is claiming that the state's theory of how the collision occurred is physically impossible because the photographs are inconsistent with the diagrams and testimony of Patrolman Norris. More particularly, the defendant maintains that the photographs of the vehicles show that the left front side of each vehicle sustained the most damage, but the diagrams introduced through Patrolman Norris show the point of impact to be the right front sides of each vehicle. As a result, the defendant asks this court to set aside his convictions.

We are not persuaded that this case merits application of the "physical facts rule." The "physical facts rule" has been variously explained as: "the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded," *State v. Hornsby*, 858 S.W.2d 892, 894 (Tenn. 1993); when "the testimony of a witness 'cannot possibly be true, is inherently unbelievable, or is opposed to natural laws,' courts can declare the testimony incredible as a matter of law and decline to consider it," *id.* (quoting *United States v. Narciso*, 446 F. Supp. 252, 282 (E.D. Mich. 1977)); and when "'undisputed physical facts are entirely inconsistent with and opposed to testimony . . . the physical facts must control,'" *id.* (quoting *Wood v. United States*, 342 F.2d 708, 713 (8th Cir. 1965)). A high threshold, however, must first be surmounted to apply the rule. "We caution," wrote the supreme court in *Hornsby*, "that the power to disregard oral testimony because of its inherent lack of believability is one that should be used sparingly." The court continued,

> Only when the testimony is inherently improbable and impossible of belief should courts intervene to declare it incredible as a matter of law. When the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility. Deciding whether there are inconsistencies in testimony, reconciling conflicts in testimony, and how this might affect a witness's credibility, are all within the province of the jury. As the court observed in *Smith v. Steele*, 44 Tenn. App. 238, 313 S.W.2d 495 (Tenn. App. 1956), "the improbability of the truth of the testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses." *Smith* at 508.

*Hornsby*, 858 S.W.2d at 895-96 (citations omitted).

In this case, Patrolman Norris testified that the collision occurred entirely in the northbound lane and that the point of impact, based on where the pavement had been gouged, was "2.75 feet west of the east fog line." The photographs in this case show, *inter alia*, that the left front side of each vehicle incurred the brunt of the damage, and Patrolman Norris, in explaining what the photographs depicted, said that both vehicles were "impacted on the left front fender."

The diagrams to which the defendant refers do not, in our opinion, indicate that the point of impact was the right front side of each vehicle. In addition, the diagrams were offered to illustrate Patrolman Norris's testimony, and his testimony as noted above was that the vehicles collided on the left front fenders. Finally, any possible inconsistency among the diagrams, photographs, and expert testimony simply does not warrant application of the physical facts rule.

As for the defendant's assertion that the evidence is insufficient to show that his intoxication was the proximate cause of the bodily injuries in this case, we note that the defendant cites no authority, offers no supporting argument, and includes the assertion only in the Conclusion section of his brief. The issue, in our opinion, has been waived. *See* R. Tenn. Ct. Crim. App. 10(b). Even so, a rational jury could certainly conclude from the evidence in this case that the defendant's undisputed alcohol intoxication – .17 percent – was the proximate cause of his reckless operation of his vehicle, swerving into the northbound lane of traffic, colliding with Ms. Patton's vehicle and, thereby, injuring the three victims.

The evidence, we hold, is sufficient to support the defendant's convictions for vehicular assault and assault, and we accordingly affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE