# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 19, 2011

## LEMAR BROOKS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 40877     John H. Gasaway, III, Judge**

---

**No. M2010-02451-CCA-R3-PC - Filed January 11, 2012**

---

The Petitioner, Lemar Brooks, appeals as of right from the Montgomery County Circuit Court's denial of his petition for post-conviction relief. The Petitioner contends that he received the ineffective assistance of both trial and appellate counsel regarding his convictions for two counts of premeditated first degree murder. Specifically, the Petitioner argues that (1) trial counsel was ineffective for failing to investigate and call two potential witnesses; (2) trial counsel was ineffective for failing to request a jury instruction regarding voluntary intoxication; (3) trial counsel was ineffective for failing "to request a jury out hearing" regarding the State's cross-examination about a witness' gang affiliation; (4) trial counsel was ineffective for failing to object to prejudicial remarks made by the State during closing arguments; (5) trial counsel was ineffective for failing to object "to the selective and vindictive prosecution by the State"; (6) trial counsel was ineffective for failing to request a jury instruction on the "physical facts" rule; (7) appellate counsel was ineffective for failing to raise the voluntary intoxication jury instruction issue on appeal; (8) appellate counsel was ineffective for failing to raise the issue of the State's prejudicial remarks on appeal; (9) appellate counsel was ineffective for failing to raise the issue of the State's "selective and vindictive prosecution" on appeal; (10) appellate counsel was ineffective for failing to challenge the standard of review used by the trial court in denying the Petitioner's petition for writ of error coram nobis; (11) the cumulative effect of trial and appellate counsels' errors establishes that their performance was deficient and that the Petitioner was prejudiced by their performance. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

William F. Kroeger, Springfield, Tennessee, for the appellant, Lemar Brooks.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

*I. Trial*

A full recitation of the facts at trial may be found in this court's opinion on direct appeal. See State v. Lemar N. Brooks, No. M2003-02304-CCA-R3-CD, 2006 WL 2738310 (Tenn. Crim. App. Sept. 26, 2006), perm. appeal denied (Tenn. Feb. 26, 2007). As pertinent to our review, the record reflects that on May 29, 1999, the bodies of Lawrence Ream, Jr. and Veronica Burnley were discovered in a motel room in Clarksville, Tennessee. Id. at *1. Their bodies were found lying on the bed farthest from the door and with dried blood on both of them. Id. Ms. Burnley was found with "one gunshot wound to the back of her head" and "a second gunshot wound to the back of her right shoulder." Id. at *4. Mr. Ream was found with "a gunshot wound to the top left side of his head" and "a second gunshot wound to his chest." Id. Based on the nature of the wounds, the medical examiner, Dr. Bruce Levy, opined that "the shooter had to have been standing somewhere near the middle of the side of the bed when the shots were fired." Id.

The motel room was registered for two nights under the name "Jimmie L. Carr" and with two people listed as staying in the room. Brooks, 2006 WL 2738310, at *1. Inside the motel room police officers recovered three small bags containing 2.6 grams of marijuana, a large bag containing 4.7 grams of marijuana, and two rolls of cash totaling $159. Id. at *2, 7. Police officers also recovered "two lead projectiles" from the room. Id. at *2. Two more projectiles were recovered from Ms. Burnley's body and a projectile fragment was recovered from Mr. Ream's body. Id. However, the murder weapon was never recovered, and the lead detective in the case admitted at trial that "there was no physical evidence linking the [Petitioner] to the crime." Id. at *6.

Key to the State's case were two eyewitnesses, Samuel Vazquez and Sophia Ross. Brooks, 2006 WL 2738310, at *1. Mr. Vazquez testified that on May 28, 1999, he met the Petitioner around 7:00 or 8:00 p.m. and that they had spent the evening smoking marijuana. Id. at *2. According to Mr. Vazquez, the two eventually picked up Ms. Ross and went to purchase more marijuana from Mr. Ream. Id. Mr. Vazquez estimated that the three arrived at Mr. Ream's motel room at 12:30 or 1:00 a.m. on May 29, 1999. Id. at *3. Mr. Vazquez testified that, at some point, Mr. Ream "took a gallon-sized plastic bag half-filed with

-2-

marijuana out of the night stand." Id. Mr. Vazquez estimated "that the bag contained a little over a quarter pound of marijuana" and was worth "$300 or $400." Id. Mr. Vazquez testified that the group talked for a while and watched the movie "Aliens." Id. Mr. Vazquez eventually fell asleep on the bed closest to the door. Id.

According to Mr. Vazquez, later that morning he awoke to the sound of two gunshots. Brooks, 2006 WL 2738310, at *3. Mr. Vazquez testified that he saw an unknown "figure dressed in black standing with an outstretched arm at the foot of the victims' bed" and that he thought the figure was holding a handgun. Id. Mr. Vazquez testified that he then saw Ms. Ross jump over her bed and run out of the motel room. Id. Mr. Vazquez followed her and heard two more gunshots as he fled the room. Id. According to Mr. Vazquez, before he fled the room, he noticed that it was 4:11 a.m. Id. Mr. Vazquez testified that he and Ms. Ross ran behind the motel, and a few minutes later, they saw the Petitioner run to his vehicle. Id. The Petitioner urged Mr. Vazquez and Ms. Ross to get into his SUV. Id. Mr. Vazquez testified that once he got in the backseat, he asked the Petitioner if the victims were dead and the Petitioner said, "[T]hey got to be, I shot them both in the head." Id. The Petitioner then drove Mr. Vazquez and Ms. Ross to Mr. Vazquez's house where he instructed them to get out of the vehicle. Id.

Mr. Vazquez testified that he did not remember seeing the Petitioner with a gun that night. Brooks, 2006 WL 2738310, at *3. Mr. Vazquez admitted that in his first statement to the police he did not mention that the Petitioner had "told him that he had shot both victims in the head." Id. at *4. Mr. Vazquez testified that he was extremely intoxicated and frightened at the time of the shooting. Id. Mr. Vazquez "explained the numerous inconsistencies in his testimony and his apparent inability to remember details of the incident by stating that he had smoked ten or eleven blunts by the time of the shooting." Id. Mr. Vazquez denied that he had gone to the motel to rob the victims and denied that he had been the one to kill and rob the victims. Id.

Ms. Ross testified that she was at the home of Monique Harrison on the evening of May 28, 1999, when the Petitioner and Mr. Vazquez showed up. Brooks, 2006 WL 2738310, at *5. According to Ms. Ross, she collected $40 from her friends and left with the Petitioner and Mr. Vazquez to purchase some marijuana from Mr. Ream. Id. Ms. Ross testified that she purchased $40 worth of marijuana from Mr. Ream, which the group then smoked while they talked and watched the movie "Aliens." Id. According to Ms. Ross, the victims were lying together on one bed, she was leaning against the headboard of the bed closest to the door, Mr. Vazqeuz was lying across the foot of her bed, and the Petitioner was sitting in a chair. Id. Ms. Ross testified that at some point, the Petitioner got up from his chair, walked to "about halfway along the side of the victims' bed," and started shooting. Id. Unlike Mr.

Vazquez, Ms. Ross testified that she heard only two shots and that she and Mr. Vazquez ran across the highway to a "clump of woods" where they hid from the Petitioner. Id.

According to Ms. Ross, the Petitioner eventually found her and Mr. Vazquez, "pointed his gun at them, and threatened to kill them if they did not get in his vehicle." Brooks, 2006 WL 2738310, at *5. Ms. Ross testified that the Petitioner drove them back to Mr. Vazquez's house, keeping his gun pointed at them the whole time and repeatedly stating that "he should kill them both right then." Id. At Mr. Vazquez's house, the Petitioner forced them out of the car at gunpoint and "threatened to kill them if they reported what had just transpired." Id. Ms. Ross testified that it was daybreak when Mr. Vazquez drove her back to Ms. Harrison's home. Id. Ms. Ross also testified that when she arrived at Ms. Harrison's house, she immediately woke Ms. Harrison and Ms. Harrison's mother to tell them what had happened. Id. Both women wanted Ms. Ross to call the police but "she was too frightened to do so." Id. at *6. Instead, she left that afternoon on a preplanned trip to Flint, Michigan. Id.

On cross-examination, Ms. Ross admitted that in her first statement to the police she told them that she ran all the way back to Ms. Harrison's house. Brooks, 2006 WL 2738310, at *6. Ms. Ross testified that she had "exaggerated" when she told the police this because "she was still shaken from her experiences at the time she made the statement." Id. Ms. Ross also reiterated on cross-examination that she immediately woke up Ms. Harrison and Ms. Harrison's mother when she arrived at Ms. Harrison's house and that she thought she reached the house around 5:00 a.m. Id. However, the lead detective testified that Ms. Harrison told him that it was 11:00 a.m. or 12:00 p.m. on May 29, 1999, before Ms. Ross told her about the murders. Id.

In addition to challenging the testimony of Ms. Ross and Mr. Vazquez, the Petitioner presented an alibi defense at trial. Troy Pruitt testified that he saw the Petitioner walking down Judy Lynn Drive in Clarksville at approximately 3:00 a.m. on May 29, 1999. Brooks, 2006 WL 2738310, at *7. Mr. Pruitt estimated that the murder scene was a 5-minute drive or a 45-minute walk from where he saw the Petitioner. Id. On cross-examination Mr. Pruitt admitted that he was a member of a gang and that he had committed an aggravated robbery for the gang. Geremie Richard Ebert testified that sometime in May 1999, he was babysitting children in Cadiz, Kentucky, when the Petitioner arrived at the home around 4:00 a.m. and stayed until after daybreak. Id. However, Mr. Ebert admitted that he was unsure if the Petitioner was actually the man that he saw that morning and that he "was unable to recall the number of children he babysat, their names, or their ages." Id. Lisa Cunningham testified that Mr. Ebert was babysitting her child on May 29, 1999. Id. According to Ms. Cunningham, she returned home around 5:30 a.m. to find the Petitioner waiting on her. Id. Ms. Cunningham initially told the police that the Petitioner had told her "that, should anyone ask, he had been in the home all evening." Id. However, at trial Ms. Cunningham testified

that the Petitioner never made that statement and that "she merely told the police officers what she thought they wanted to hear." Id.

Based upon the foregoing evidence, the jury convicted the Petitioner of two counts of premeditated first degree murder. Brooks, 2006 WL 2738310, at *1. The Petitioner was sentenced to consecutive terms of life imprisonment. Id.

*II. Error Coram Nobis Hearing*

The Petitioner filed a petition for writ of error coram nobis with the trial court while his direct appeal was pending in this court. Brooks, 2006 WL 2738310, at *1. At the subsequent hearing, Judge Justin Saunders testified that "sometime before the defendant's trial he was at a party when [Ms.] Ross shouted 'out of the blue' that she had shot [Mr. Ream] in the head." Id. at *8. Mr. Saunders admitted that he did not tell the police about Ms. Ross's alleged statement "because he was engaging in illegal activity at the time." Id. Mr. Saunders also speculated that there were other people at the party who should have heard Ms. Ross's statement, but they "were too frightened to come forward." Id. Mr. Saunders denied being a gang member and denied knowing that the Petitioner was a self-pronounced gang member. Id. The State presented testimony from a police officer that Mr. Saunders had previously stated he was a gang member. Id. The trial court found that Mr. Saunders' testimony "was not credible and likely would not have been believed by the jury" and concluded that "the evidence would not have changed the outcome of the trial." Id. The Petitioner appealed the trial court's decision and both his direct appeal and the error coram nobis appeal were consolidated for this court's review. Id. at *1.

*III. Direct Appeal*

On direct appeal, the Petitioner raised the following issues:

(1) whether the trial court erred by not instructing the jury that the State's key witnesses were accomplices as a mater of law, whose testimony had to be corroborated by independent evidence; (2) whether the evidence was sufficient to show premeditation; and (3) whether the trial court erred by denying the [Petitioner's] petition for writ of error coram nobis . . . .

Brooks, 2006 WL 2738310, at *1. With respect to the issue of the accomplice jury instruction, this court concluded that "the proof would not have justified an instruction that the witnesses were accomplices as a matter of law." Id. at *9. This court also concluded that the evidence was sufficient for the jury to find that the Petitioner acted with premeditation.

-5-

Id. at *11. Finally, this court concluded that the trial court did not abuse its discretion in denying the Petitioner's petition for writ of error coram nobis. Id. at *12.

## IV. Post-Conviction Hearing

On February 1, 2008, the Petitioner timely filed a pro se petition for post-conviction relief. Counsel was appointed and amended petitions were filed on April 13 and May 19, 2010. The post-conviction court held a hearing on the petition on May 19 and August 19, 2010. On October 7, 2010, the post-conviction court entered a detailed order denying post-conviction relief. The Petitioner timely filed a notice of appeal on October 18, 2010.

### A. Petitioner's Proof

At the hearing, the Petitioner called Montgomery County Sheriff's Deputy Erin William Kellett. Deputy Kellett testified that as part of the investigation of this case, he took a statement from James Rogers Taylor, II. The Petitioner introduced Mr. Taylor's statement at the hearing. According to the statement, the morning after the murders Mr. Taylor, Jimmie Carr, and Rod Crouch stopped by the house where Ms. Ross was staying. Mr. Taylor told Deputy Kellett that Ms. Ross asked if they could "take her to the mall so she could get some shoes." The group dropped Mr. Carr off and went to the mall and then took Ms. Ross back to the house where she was staying. The Petitioner also introduced a statement given by Mr. Carr in which he told the police that the morning after the murders the group "talked to" Ms. Ross. Deputy Kellett testified that he did not interview Mr. Carr. The detective who interviewed Mr. Carr was not called as a witness at the post-conviction hearing. Neither Mr. Taylor nor Mr. Carr testified at the post-conviction hearing.

At the hearing, the Petitioner testified that he asked trial counsel to subpoena Mr. Taylor and Mr. Carr, but that trial counsel failed to call them as witnesses. The Petitioner said that he wanted Mr. Taylor to testify because his statement called into question Ms. Ross's credibility. The Petitioner reasoned that if Ms. Ross had gone to the mall as Mr. Taylor had told Deputy Kellett, then this would call into question her timeline of events the morning after the murders. The Petitioner also concluded that Mr. Taylor's statement refuted Ms. Ross's testimony that she was extremely frightened after the shootings. The Petitioner pointed out that if Ms. Ross had money to buy shoes the morning after the murders, then there was no need for her to borrow money from her friend to purchase marijuana from Mr. Ream the night before. The Petitioner concluded that Mr. Taylor's testimony would have been important because it would have shown that Ms. Ross "was lying." The Petitioner also stated that he wanted Mr. Carr to testify because he could corroborate Mr. Taylor's statement.

-6-

The Petitioner testified that he believed trial counsel was ineffective because he failed to request a jury instruction on voluntary intoxication. The Petitioner cited to numerous instances in the trial record where Mr. Vazquez and Ms. Ross testified that the Petitioner smoked marijuana with them. The Petitioner also pointed out that Mr. Vazquez described himself as being "very high" at the time of the murders. Additionally, the Petitioner cited the State's closing argument in which it described Mr. Vazquez and Ms. Ross as being "really high" at the time of the shootings. The Petitioner reasoned that if Mr. Vazquez and Ms. Ross were intoxicated at the time of the shootings, then he had to be intoxicated as well. The Petitioner concluded that Mr. Vazquez and Ms. Ross's testimony proved that he could not form the requisite premeditation necessary for his first degree murder conviction and that the jury instruction on voluntary intoxication was warranted in his case.

The Petitioner also testified that he believed trial counsel was ineffective because he failed to object strenuously enough to the State's cross-examination of Mr. Pruitt. According to the Petitioner, the State was implying that the Petitioner was a gang member when it asked Mr. Pruitt about his gang membership. The Petitioner also stated that he was prejudiced by the State's cross-examination of Mr. Pruitt because "as far as the jury is concerned, they are all like well, this guy is a gang member, he's testifying for his buddy. There's no way that we are going to believe him . . . ." The Petitioner concluded that trial counsel should have objected earlier and requested a jury-out hearing before any cross-examination regarding Mr. Pruitt's gang affiliation could occur.

The Petitioner further testified that trial counsel had abandoned "a sound trial strategy" by failing to request a jury instruction on the "physical facts" rule. The Petitioner contended that trial counsel should have done more during the course of the trial to show that Dr. Levy's testimony about the distance from which the shots were fired did not match Mr. Vazquez and Ms. Ross's testimony about where the shooter was standing. The Petitioner described his understanding of the physical facts rule as being "an instruction given to the jury . . . that . . . if testimony and physical evidence conflict with one another, then the undisputed physical facts or the physical evidence, it will always override and negate any testimony." The Petitioner opined that if an instruction on the physical facts rule had been requested, then Mr. Vazquez and Ms. Ross's testimony would have been disregarded and the jury could have "see[n] for themselves" that the two witnesses were lying.

The Petitioner also faulted trial counsel for not objecting to what he considered to be several instances of prosecutorial misconduct during the State's closing argument. The Petitioner testified that he believed the prosecutor committed misconduct by (1) misstating the evidence presented at trial by theorizing that Mr. Ream had kept a gun in the motel dresser and suggesting the victims were robbed; (2) vouching for the credibility of the State's witnesses and calling the Petitioner's witnesses liars; (3) intentionally inflaming the

prejudices of the jury by referring to the criminal backgrounds of some of the Petitioner's witnesses; (4) arguing issues greater than the Petitioner's guilt or innocence by urging the jury not to vent their frustrations with the poor quality of the police investigation by returning a not guilty verdict; and (5) arguing facts outside the record. The Petitioner also faulted trial counsel for not objecting "to the selective and vindictive prosecution" of a witness he presented at his motion for new trial hearing. The Petitioner contended that the State's questioning of the witness about his gang affiliation amounted to "selective and vindictive prosecution."

The Petitioner testified that he believed appellate counsel was ineffective because he failed to raise the issue of the voluntary intoxication jury instruction on appeal. The Petitioner also faulted appellate counsel for failing to raise the issues of the alleged prosecutorial misconduct and the State's "selective and vindictive prosecution" on appeal. Additionally, the Petitioner alleged that appellate counsel was ineffective for failing to challenge on appeal the standard of review used by the trial court in the error coram nobis proceeding.

*B. State's Proof*

Trial counsel testified that the Petitioner's primary defense at trial was that the Petitioner was not present and did not commit the murders. Trial counsel also attempted to emphasize that there was no forensic evidence to connect the Petitioner to the murder scene and to challenge the credibility of the State's two eyewitnesses. Trial counsel admitted that if Mr. Taylor had testified to the facts in his statement, it could have impeached Ms. Ross and "[t]hat sounds like something that would matter and I overlooked it." Trial counsel further admitted that having someone to testify about Ms. Ross's demeanor after the shooting could have been important. However, trial counsel also testified that he had reviewed Mr. Taylor's statement prior to trial, that it did not bring "anything to the proceedings in terms of alibi," and that it did not have "any useful information at all." Trial counsel also reviewed Mr. Carr's statement and did not think that it had any useful information either, although he did have his investigator attempt to contact Mr. Carr.

With regards to the voluntary intoxication jury instruction, trial counsel testified that he did not request it because he did not like using "alternative defenses." Trial counsel explained that the Petitioner's "primary defense was I wasn't there, I didn't do it." Trial counsel felt that requesting an instruction on voluntary intoxication on top of the alibi defense "sound[ed] like you are admitting something that you just denied" and that "juries find that confusing and suspicious." Trial counsel did admit that voluntary intoxication was probably a viable defense. Trial counsel also admitted that he had pursued an alternative defense by arguing that Ms. Ross and Mr. Vazquez were accomplices and that their

-8-

testimony required corroboration. However, trial counsel testified that he "didn't want to place too much emphasis on it" because he felt alternative defenses were confusing to the jury.

Trial counsel testified that he did not object to Mr. Pruitt having been asked about his gang affiliation because "the State was not during these questions, implying [that the Petitioner] was a gang member. The State was implying that the witness [Mr.] Pruitt was a gang member." Trial counsel said that he also thought that it was better not to object because "sometimes that just calls more attention to it and it is better to let it slide." Trial counsel further hoped that the jury would consider that perhaps the murders had been gang related because there had been some evidence that Mr. Ream was a gang member. Trial counsel did admit that one reason for the State to question Mr. Pruitt about his gang affiliation would have been to imply that the Petitioner was also a gang member.

Trial counsel testified that he did not challenge Dr. Levy's conclusions about where the shooter had been standing because he did not "think it was quite relevant" given the Petitioner's alibi defense. Trial counsel felt that Dr. Levy's conclusions impeached one of the witnesses but actually corroborated the other eyewitness. Trial counsel was not asked about why he did not object to the alleged prosecutorial misconduct during the State's closing argument or the State's alleged "selective and vindictive prosecution" of one of the Petitioner's witnesses.

Appellate counsel testified that he did not raise the voluntary intoxication issue on appeal because trial counsel had not requested the instruction, had not objected to the jury instructions "as they were given," and did not raise the issue in the motion for new trial. Appellate counsel felt that the issue had been waived and would have been analyzed on appeal under the plain error standard. Appellate counsel testified that plain error was "a fairly substantial hurdle to overcome and it was [his] opinion that [he] could not overcome that hurdle." Appellate counsel also felt that the voluntary intoxication defense was "inconsistent with the main thrust of the defense." Appellate counsel also testified that he did not challenge on appeal the State's closing argument because "[i]t just didn't strike [him] as something that needed to be raised."

Appellate counsel testified that he felt the trial court used the wrong standard of review in denying the Petitioner's petition for writ of error coram nobis. However, appellate counsel testified that he did not specifically challenge the standard used by the trial court on direct appeal. Instead, appellate counsel "highlight[ed] what the standard was and revisit[ed] what the testimony was and argue[d] to [the appellate court] that the writ should have been granted."

## C. Post-Conviction Court's Order

Following the hearing, the post-conviction court took the matter under advisement and issued a written order denying the petition on October 7, 2010. With regard to the Petitioner's claim that counsel was ineffective by failing to call Mr. Taylor and Mr. Carr as witnesses, the post-conviction court noted that while their statements had been introduced, "little other evidence concerning the statements was introduced at the hearing." The post-conviction court concluded that "there was no evidence presented at the evidentiary hearing by which the court could assess the veracity of the statements or the potential credibility of Mr. Taylor and Mr. Carr as witnesses" and that absent such evidence the Petitioner could not establish ineffective assistance of counsel.

The post-conviction court next addressed the Petitioner's contention that both trial and appellate counsel were ineffective for failing to address the voluntary intoxication issue. The post-conviction court stated that the Petitioner's argument was essentially that because Mr. Vazquez and Ms. Ross were intoxicated at the time of the shooting, "the [P]etitioner necessarily was as well." The post-conviction court noted that there was ample evidence that the Petitioner had smoked marijuana prior to the shootings, but "there was no evidence in the record that the [P]etitioner's smoking marijuana rendered him so intoxicated that he could not form the requisite mental state to commit the premeditated and intentional act of first degree murder." Therefore, the post-conviction court declined to reach the same conclusion as the Petitioner, "absent any evidence at trial or in the instant proceedings to support the [P]etitioner's assertion." The post-conviction court concluded that a jury instruction on voluntary intoxication was not warranted, and trial and appellate counsel were not ineffective regarding this issue.

With regard to the State's cross-examination of Mr. Pruitt, the post-conviction court concluded that while "the exchange . . . would have been more proper for a jury-out hearing[,]" the Petitioner was not prejudiced by trial counsel's failure to request a jury-out hearing. The post-conviction court noted Mr. Pruitt never stated that the Petitioner was a gang member and was asked whether being in a gang required him to testify for other "people" accused of crimes rather than other gang members. Mr. Pruitt also denied that his gang affiliation required him to testify "on behalf of persons accused of a crime." Additionally, the post-conviction court noted that trial counsel testified that he did not object vigorously to the State's cross-examination because he did not want to over emphasize it and because he hoped that the jury would come to the conclusion that the murders were gang related. The post-conviction court concluded that these "tactics seem reasoned trial strategy, which this court will not second-guess on post-conviction."

With regard to trial and appellate counsel's failure to address the State's alleged prejudicial remarks made during closing arguments, the post-conviction court noted that trial counsel had not been asked about the State's closing argument during the hearing. Because trial counsel had not testified about the issue, the post-conviction court could "only speculate as to why [he] did not object during the State's closing argument." As for appellate counsel, the post-conviction court concluded that his decision not to raise the issue on appeal was "a reasonable strategy" which could not be second-guessed on post-conviction review.

With regard to the issue of the State's alleged "selective and vindictive prosecution," the post-conviction court stated that, based upon the Petitioner's testimony, this issue arose out of the State's cross-examination of a witness during the motion for new trial hearing. The post-conviction court concluded that there was no evidence that this witness "was ever 'prosecuted' for anything related to this case" and even if he had been, the Petitioner would not have had standing to challenge the issue. Accordingly, the post-conviction court concluded that this issue was without merit.

Regarding trial counsel's failure to request a jury instruction on the physical facts rule, the post-conviction court concluded that trial counsel's performance was not ineffective. The post-conviction court noted that had the physical facts rule applied to this case, the proper procedure would have been for the trial court to rule that the testimony was inadmissible as a matter of law instead of issuing a jury instruction. However, the post-conviction court concluded that the physical facts rule was not applicable to this case. Instead, any conflict between Dr. Levy's opinion about where the shots had been fired and the eyewitness' testimony was an issue of credibility for the jury to decide.

As for the Petitioner's issue regarding appellate counsel's failure to challenge the standard of review used by the trial court in his error coram nobis proceeding, the post-conviction court concluded that appellate counsel was not ineffective. The post-conviction court noted that "a defendant is not entitled to counsel on collateral review of his convictions or sentence." An error coram nobis proceeding is a collateral review of a defendant's conviction or sentence. The post-conviction court also noted that in "those instances where a defendant has no constitutionally guaranteed right to counsel, there can be no deprivation of effective assistance of counsel." Accordingly, the post-conviction court concluded that this issue had no merit.

Finally, the post-conviction court concluded that because "the court has found that none of the [P]etitioner's previously-listed issues entitle him to relief, the court also finds that the [P]etitioner is not entitled to relief based upon cumulative error." After the post-conviction court entered its order denying the petition, the Petitioner filed a timely notice of appeal. This appeal followed.

-11-

## I. Alleged Ineffective Assistance of Trial Counsel

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

## A. Mr. Taylor and Mr. Carr's Statements

The Petitioner contends that trial counsel was ineffective for failing to call Mr. Taylor and Mr. Carr at trial. The Petitioner argues that Mr. Taylor and Mr. Carr's statements were critical evidence that could have been used to impeach Ms. Ross's credibility. The Petitioner also argues that the statements, coupled with evidence from the error coram nobis hearing, could have been used to establish Ms. Ross as an accomplice. The Petitioner admits that he did not subpoena Mr. Taylor or Mr. Carr to testify at the post-conviction hearing. However, the Petitioner, citing Pylant v. State, 263 S.W.3d 854 (Tenn. 2008), contends that he did not need Mr. Taylor and Mr. Carr to testify at the post-conviction hearing because their statements to the police were admitted into evidence and the statements provided the post-conviction court "with the information [needed] to determine whether the testimony would have been admissible and material." The State responds that this case is distinguishable from Pylant and that the Petitioner has waived the issue by failing to call Mr. Taylor and Mr. Carr to testify at the post-conviction hearing.

-12-

This court has long held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Pylant, 263 S.W.3d at 869. Generally, "this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Black, 794 S.W.2d at 757. Live testimony from the witness is usually necessary for the post-conviction court to evaluate whether the testimony is admissible, material, and credible. Pylant, 263 S.W.3d at 869-70. We cannot speculate as to what a witness may have said if presented or how the witness may have responded to a rigorous cross-examination. Black, 794 S.W.2d at 757.

In Pylant, the petitioner argued that his trial counsel was ineffective for failing to put on proof that someone else killed the victim. 263 S.W.3d at 869. At the post-conviction hearing, the petitioner did not have this alleged perpetrator testify. Id. Instead, the petitioner presented several witnesses who testified about inculpatory statements they heard the alleged perpetrator make. Id. On appeal, the State argued that the petitioner's claim should have been denied because he failed to call the alleged perpetrator at the post-conviction hearing. Id. at 872. Our supreme court concluded that Black did not bar the petitioner's claim because the petitioner had "presented the 'critical evidence' of [the alleged perpetrator's] alleged inculpatory statements through other witnesses–an acceptable alternative strategy under the unique circumstances of this case given the very real possibility that [the alleged perpetrator] would refuse to testify to any such admissions and/or her alleged culpability in the victim's death." Id. at 872-73 (emphasis added). However, our supreme court also emphasized "that post-conviction counsel generally risks the denial of a post-conviction claim if he or she fails to call at the post-conviction hearing all witnesses who they claim should have been called at trial." Id. at 873.

The unique circumstances of Pylant are not present in this case. The Petitioner only presented the statements Mr. Taylor and Mr. Carr gave to the police and some very basic background information from Deputy Kellett. There was nothing about the statements that would suggest that Mr. Taylor or Mr. Carr would refuse to testify at the post-conviction hearing. Therefore, the alternative strategy used in Pylant was not necessary in this case. Furthermore, we agree with the post-conviction court's assessment that "there was no evidence presented at the evidentiary hearing by which the court could assess the veracity of the statements or the potential credibility of Mr. Taylor and Mr. Carr as witnesses." Accordingly, we conclude that the post-conviction court did not err in denying the Petitioner's claim that trial counsel was ineffective for failing to call Mr. Taylor and Mr. Carr as witnesses at trial.

*B. Jury Instruction on Voluntary Intoxication*

The Petitioner contends that trial counsel was ineffective by failing to request a jury instruction on voluntary intoxication. The Petitioner cites to several instances where Mr. Vazquez and Ms. Ross testified at trial that they were "high" at the time of the shooting. The Petitioner reasons that because Mr. Vazquez and Ms. Ross were intoxicated and there was evidence that the Petitioner had smoked marijuana that day as well, a jury instruction on voluntary intoxication was warranted. The State responds that while there was evidence that the Petitioner smoked marijuana prior to the shootings, there was no evidence presented at trial establishing that the Petitioner was intoxicated. The State further responds, that even if a jury instruction on voluntary intoxication was warranted based upon the evidence at trial, trial counsel's decision not to request one was based upon sound professional judgment and should not be second-guessed.

Voluntary intoxication is not in itself a defense to prosecution, but it "is admissible in evidence, if it is relevant to negate a culpable mental state." Tenn. Code Ann. § 39-11-503(a). In Harrell v. State, this court set forth the rule as to when the proof requires a voluntary intoxication instruction:

> Proof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle the accused to jury instructions . . .; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent . . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity.

The burden is on the defendant to produce sufficient proof of intoxication to warrant a jury instruction. Hicks v. State, 533 S.W.2d 330, 331-32 (Tenn. Crim. App. 1975) (holding that the "mere fact that there was some evidence that the defendant had been drinking, without more, is not sufficient to raise the issue of voluntary intoxication"). However, when the evidence establishes that a defendant was "highly intoxicated" a jury instruction will be warranted even without a special request. Brown v. State, 553 S.W.2d 94, 95-96 (Tenn. Crim. App. 1977).

We agree with the post-conviction court that there was no evidence presented demonstrating that the Petitioner was so intoxicated he could not form the requisite mental state to commit a premeditated first degree murder. The evidence at trial established that the Petitioner smoked marijuana prior to the shootings, but there was no evidence presented regarding how intoxicated the Petitioner was at the time of the shootings. Despite the Petitioner's arguments to the contrary, evidence regarding how intoxicated Mr. Vazquez and Ms. Ross were cannot be imputed to the Petitioner. Furthermore, trial counsel testified that

-14-

requesting a jury instruction on voluntary intoxication would undermine his trial strategy of attempting to establish an alibi for the Petitioner. We decline to second-guess trial counsel's strategic decision. See Ben Mills v. State, No. W2005-00480-CCA-R3-PC, 2006 WL 44381, at *8-9 (Tenn. Crim. App. Jan. 5, 2006), perm. appeal denied (Tenn. May 1, 2006). Accordingly, we conclude that trial counsel was not ineffective in failing to request a jury instruction on voluntary intoxication.

### C. Testimony Regarding Mr. Pruitt's Gang Affiliation

The Petitioner contends that trial counsel was ineffective for failing to request a jury-out hearing regarding the State's "gang related questioning" of Mr. Pruitt on cross-examination. The Petitioner argues that the State's questioning regarding Mr. Pruitt's gang affiliation "insinuated to the jury that the [Petitioner] was a gang member and that [Mr. Pruitt] was there to testify for his fellow gangster." The Petitioner contends that the evidence was inadmissible under Tennessee Rule of Evidence 404(b) and that trial counsel should have requested a jury-out hearing as provided in Rule 404(b). The State responds that trial counsel's decision not to object more strenuously to the cross-examination was reasoned trial strategy that should not be second-guessed here.

Mr. Pruitt testified at trial in his prison uniform and admitted that he had been convicted of robbery and had two pending burglary charges. On cross-examination, the State asked Mr. Pruitt if he was familiar with "the GTC." Mr. Pruitt admitted that he was, explained that the GTC was a gang, and admitted that he "used to be" involved with the GTC. The State asked Mr. Pruitt what his "position" was in the gang and Mr. Pruitt responded that he was "like a foot soldier." When asked what kind of things a foot solider did for the gang, Mr. Pruitt responded that foot soldiers committed crimes, and he testified that the robbery he was convicted of was an example of "some of the things [he] did" for the gang. Mr. Pruitt denied that he ever hurt anyone who "broke gang discipline."

Mr. Pruitt was later asked if there was "a rule in the GTC about testifying against people who get charged with crimes." Trial counsel objected to the question as being irrelevant, and the State responded that he was attempting to establish bias. The trial court overruled the objection and gave the prosecutor "some latitude." When asked again, Mr. Pruitt responded that it was not a rule, that it was "nothing, [he had] never heard of it." Mr. Pruitt was then asked if "in prison don't they have a rule against not testifying against people charged with crimes too." Mr. Pruitt responded that it was "not a rule, but most people don't do it." The State then asked Mr. Pruitt if "people [were] encouraged in the gang and in the prison to testify for people charged with crimes." At this point, the trial court ordered the State and trial counsel to approach the bench. The trial court inquired if the State had a good faith basis that the Petitioner was in the same gang as Mr. Pruitt. The State responded that

it did not. The trial court ordered the State "to move on" and instructed the jury to disregard the State's last question. At no time was Mr. Pruitt asked if the Petitioner was in a gang.

Tennessee Rule of Evidence 404(b) provides that evidence of other wrongs or bad acts is "not admissible to prove the character of a person in order to show action in conformity with the character trait." However, Rule 404(b) only applies to acts which reflect upon the character of the underlined criminal accused. See State v. Stevens,78 S.W.3d 817, 837 (Tenn. 2002). Mr. Pruitt was never asked if the Petitioner was a member of a gang. Mr. Pruitt was asked if the tenants of gang membership or prison life required him not to testify against "people charged with crimes." The questions focused on Mr. Pruitt's gang affiliation and whether that created some sort of bias on the Defendant's behalf. Rule 404(b) was not applicable because the acts at issue reflected upon the character of Mr. Pruitt and not the character of the Petitioner. Accordingly, trial counsel could not have been ineffective for failing to raise a Rule 404(b) objection when Rule 404(b) did not apply in the first place.

Tennessee Rule of Evidence 608(b) governs the impeachment of a witness for prior bad acts and specifically provides for a jury-out hearing "upon request." However, the State was not seeking to introduce evidence of Mr. Pruitt's gang affiliation to impeach his character for truthfulness. Instead, the State sought to introduce the evidence to show bias pursuant to Rule 616. Rule 616, unlike Rules 404(b) and 608(b), does not require the trial court to hold a jury-out hearing regarding the evidence upon a party's request. Accordingly, we conclude that trial counsel was not ineffective in failing to request a jury-out hearing regarding Mr. Pruitt's gang affiliation. Furthermore, trial counsel testified at the post-conviction hearing that he did not object more strenuously because he did not want to over emphasize the evidence and because he hoped that the jury would come to the conclusion that the murders were gang related. We agree with the post-conviction court that these "tactics seem reasoned trial strategy, which this court will not second-guess on post-conviction."

### D. State's Closing Argument

The Petitioner contends that trial counsel was ineffective for failing to object to allegedly prejudicial statements made during the State's closing argument. The Petitioner argues that during closing arguments, the prosecutor repeatedly characterized the Petitioner's alibi witnesses as being unbelievable and liars. The Petitioner also argues that the prosecutor improperly bolstered the credibility of Mr. Vazquez and Ms. Ross. The State responds that the issue is without merit because trial counsel was not questioned about the issue at the post-conviction hearing.

This court has previously considered "whether the failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel." Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010), perm. appeal denied (Tenn. May 11, 2010). "The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." Id. Trial counsel could decide not to object for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. Id. (quoting Gregory Paul Lance v. State, No. M2005-01675-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App. Aug. 16, 2006), perm. appeal denied (Dec. 18, 2006)). Because of this, testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective. This court has previously held that "[w]ithout testimony from trial counsel or some evidence indicating that his decision was not a tactical one, we cannot determine that trial counsel provided anything other than effective assistance of counsel." State v. Leroy Sexton, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007). The Petitioner did not present any evidence at the post-conviction hearing to suggest that trial counsel's failure object to the prosecutor's remarks was anything other than a tactical decision. Furthermore, trial counsel was not asked at the hearing about why he did not object to the prosecutor's remarks. Accordingly, we must conclude that trial counsel provided effective assistance of counsel in this regard.

### E. Selective and Vindictive Prosecution

The Petitioner contends that he received ineffective assistance of trial counsel by trial counsel's failure to object "to the selective and vindictive prosecution by the State." However, in his brief, the Petitioner failed to include any argument on this issue, cite to any evidence that the State engaged in "selective and vindictive prosecution," make any citations to authorities on the issue, or make any appropriate references to the record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also State v. Sanders, 842 S.W.2d 257, 260-61 (Tenn. Crim. App. 1992). Accordingly, we conclude that the Petitioner has waived this issue.

### F. "Physical Facts" Rule

The Petitioner contends that "the [p]hysical [f]acts jury instruction should have been given" and that trial counsel was ineffective for failing to request it and failing "to advance the theory that it was physically impossible for the fatal shots to have been fired in the manner described by the State's two eye witnesses [sic]." The Petitioner argues that Dr. Levy's testimony contradicts the testimony provided by the two eyewitnesses and establishes that it was impossible for the shootings to have occurred as the eyewitnesses described them.

-17-

The State responds that the physical facts rule is not applicable to this case because while there was a conflict between Dr. Levy and Mr. Vazquez's testimony, that did not "demonstrate a contradiction with any well-established and universally recognized physical fact."

Our supreme court has described the physical facts rule as "the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded." State v. Allen, 259 S.W.3d 671, 679 (Tenn. 2008) (quoting State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993)). When a witness's testimony "cannot possibly be true, is inherently unbelievalbe, or is opposed to natural laws, courts can declare the testimony incredible as a matter of law and decline to consider it." Id. (quotation marks omitted). For the physical facts rule to apply, the testimony "must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." Id. at 680. For example, testimony that a witness "saw the sun set in the east" could be disregarded. Id.

However, the physical facts rule is a power "that should be used sparingly." Hornsby, 858 S.W.2d at 895. Our supreme court has cautioned that when "the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility." Id. After all, "[d]eciding whether there are inconsistencies in testimony, reconciling conflicts in testimony, and how this might affect a witness's credibility, are all within the province of the jury." Id. Put another way, "the improbability of the truth of the testimony, which justifies rejection under the physical facts rule, cannot rest upon any theory involving the consideration of the comparative credibility of the witnesses." Id. (quoting Smith v. Steele, 313 S.W.2d 495, 508 (Tenn. Ct. App. 1956)) (quotation marks and brackets omitted). Furthermore, the physical facts rule may not be invoked "where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of objects." Allen, 259 S.W.3d at 680 (quotation marks and brackets omitted).

The physical facts rule was not applicable in this case. Dr. Levy opined that the shooter was standing near the middle of the side of the bed. Ms. Ross testified that she saw the Petitioner get up and walk to the side of the bed where he began firing at the victims. Mr. Vazquez testified that he saw an unidentified man standing at the foot of the bed when the shooting occurred. Mr. Vazquez's testimony is inconsistent with the medical examiner's. However, the medical examiner's testimony was based upon "assumptions or calculations based upon estimates as to speed [and] distance." Accordingly, the physical facts rule would not bar Mr. Vazquez testimony simply because it was inconsistent with Dr. Levy's conclusions. As this court has previously noted, "the fact that a witness testifies and that

-18-

testimony ends up being inconsistent with other testimony raised at trial, . . . even if [it is] scientific testimony, does not make it inadmissable testimony." State v. Ivan Charles Graves, No. E2009-00009-CCA-R3-CD, 2011 WL 398024, at *13 (Tenn. Crim. App. Feb. 8, 2011), perm. appeal denied (Tenn. May 27, 2011). Here, the "evaluation of the evidence rests upon consideration of the comparative credibility of the witnesses." Id. (quotation marks and citation omitted). Accordingly, we conclude that the physical facts rule was not applicable at trial; therefore, this issue is without merit.

## *II. Alleged Ineffective Assistance of Appellate Counsel*

In determining whether appellate counsel's failure to raise an issue on appeal constitutes ineffective assistance of counsel, our supreme court has held that "unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim." Carpenter v. State, 126 S.W.3d 879, 887-88 (Tenn. 2004) (citing United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir. 1993)). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel" as these are "tactical and strategic choices," which should not be second-guessed. Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993).

## *A. Trial Issues*

The Petitioner contends that appellate counsel was ineffective for failing to raise the following issues on appeal: (1) lack of a voluntary intoxication jury instruction; (2) the prosecutor's allegedly prejudicial remarks made during closing arguments; and (3) the State's allegedly "selective and vindictive" prosecution. The State responds that appellate counsel was not ineffective for failing to raise the voluntary intoxication issue on appeal because the jury instruction was not warranted at trial and because appellate counsel made a sound professional judgment not to pursue the issue. The State further responds that appellate counsel also made sound professional judgments in choosing not to pursue the remaining issues on appeal.

We agree with the State that appellate counsel made a sound professional judgment in deciding not to raise the voluntary intoxication issue on appeal. Appellate counsel testified that he did not raise the issue because he felt it had been waived. Trial counsel did not request the jury instruction, had not objected to the jury instructions that were given to the jury, and did not raise the issue in the motion for new trial. Appellate counsel testified that because the issue had been waived it would have had to been analyzed using the plain error standard, and that he did not feel he would have been successful under such a strict standard.

-19-

Appellate counsel made a sound professional judgment in deciding not to pursue this issue and we will not second guess that judgment here.

Regarding the State's allegedly prejudicial remarks made during closing arguments and "selective and vindictive" prosecution, we note that the Petitioner in his brief has not made any argument on these issues as they relate to appellate counsel's performance. Additionally, the Petitioner has not cited to authorities on these issues or made appropriate references to the record. Accordingly, we conclude that these issues have been waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court").

*B. Error Coram Nobis Issue*

The Petitioner contends that appellate counsel was ineffective for failing to challenge the standard of review used by the trial court in denying his petition for writ of error coram nobis. The Petitioner argues that the trial court incorrectly analyzed the issue by deciding whether the evidence "would have" affected the outcome of the trial instead of using the proper "may have" standard. The Petitioner further contends that he was entitled to effective assistance of counsel during his error coram nobis proceeding because the petition was filed while his direct appeal was still pending. The State responds that an error coram nobis proceeding is a collateral review of a conviction and that there is no constitutionally guaranteed right to counsel during that proceeding; therefore, there can be no claim of ineffective assistance of counsel.

The United States Supreme Court has previously held that there is "no constitutional right to an attorney in state post-conviction proceedings" and that consequently, "a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman v. Thompson, 501 U.S. 722, 752 (1991). By statute in this state appointment of counsel in error coram nobis proceedings is left to the discretion of the trial court. Tenn. Code Ann. § 40-14-204. Our supreme court has previously held that there "is no federal or state constitutional right to counsel in a habeas corpus proceeding." Summers v. State, 212 S.W.3d 251, 260 (Tenn. 2007) (also holding that "[a]ppointment of counsel in a state habeas corpus proceeding is within the trial court's discretion" and citing to Tennessee Code Annotated section 40-14-204).

We conclude that because an error coram nobis proceeding is a collateral review of a conviction there is no federal or state constitutional right to counsel. Additionally, we agree with the post-conviction court that a petition for writ of error coram nobis is a collateral attack of the petitioner's conviction regardless of whether it is raised while the direct appeal

is still pending. Because there is no constitutional right to counsel in an error coram nobis proceeding there can be no claim for ineffective assistance of counsel arising from the proceeding. Accordingly, we conclude that this issue is without merit.

### III. Cumulative Error

In an one-sentence argument, the Petitioner contends that "there were numerous errors that had a cumulative effect that established that Petitioner's counsel was deficient in his performance and [that] Petitioner was prejudiced by counsel's deficient performance." The State responds that neither trial nor appellate counsel were "deficient in any of the ways attributed by the [P]etitioner," and there can be no cumulative error in the absence of individual error.

"Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Sanders, 842 S.W.2d at 260-61. In his brief, the Petitioner dedicates only one sentence to this argument and makes no citation to any authorities or any references to the record. Accordingly, we conclude that the Petitioner has waived appellate review of this issue.

### CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE